## Commonwealth *v.* Patskin, Appellant.

Argued November 11, 1952. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Alphonsus L. Casey,* with him *Myron A. Pinkus,* for appellant.

*Carlon M. O'Malley,* District Attorney, with him *Thomas J. Foley,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, January 5, 1953:

Defendant was found guilty by a jury of first degree murder and the penalty was fixed at death. The killing was a particularly brutal one. Defendant did not take the witness stand, the only defense presented in his behalf was insanity. His arguments for a new trial are based solely on alleged trial errors.

On the evening of May 10, 1951, the headquarters of the Pennsylvania State Police in Blakely Borough, Lackawanna County, received a telephone call from a person identifying himself as Theodore Patskin, a son of the defendant, saying his father had killed his

mother. A detail of officers rushed to the Patskin farm located in Jefferson Township, Lackawanna County, a farming community, where they found the defendant, who immediately admitted the killing. He directed the officers to the scene of the killing approximately one and one-half miles from the farm home, in an isolated section of the area. There they found the defendant's wife lying dead on the ground with the top of her head bashed in, two lacerated wounds on the chin and one on the neck above the Adam's apple. The post-mortem later revealed a compound fracture of the skull with many small fragments of the bone driven into the brain cavity and a crushed larynx.

The defendant was taken to the State Police Headquarters, where he was questioned about the killing and willingly detailed the gruesome incident and the events leading up to it. He manifested little or no remorse. On the way back to the police barracks defendant in talking with the officers said: "I thought of this for nineteen years. I knew I would get the electric chair for it. I did it. I took her back that road to kill her. The dirty - - -. I thought I would have to shoot her but I didn't have to. I don't feel sorry that I killed her. Nineteen years will get you. Poor kids. Poor, three kids."

In his statement at police headquarters, he told how their married life had been a series of arguments, quarrels and separations and that they had quarreled that very day before his wife left home for work. He said that she threatened to leave him again and cause his arrest as she had done before and because of this he killed her.

After being informed of his Constitutional rights he made and signed the following confession:

"Statement of William Patskin, R.D. 3, Lake Ariel, age 44, taken at the Blakely Station, Pennsylvania

State Police, Friday morning, May 11, 1951, in the presence of Corporal David Roberts, Corporal Roger Spence, Private Norman McFadden, Private Paul Capparell, Private Frank Samek, Dr. Kubasko, District Attorney Carlon M. O'Malley, Assistant District Attorneys William J. Kearney and Thomas Foley.

"By Mr. Spence:

"Q. What were you doing in the farm yesterday? A. Loading props with my car, and it was time to go for her at the end of the day. Q. What time is the end of the day? A. When I get through. Q. At the end of the day would be around 5 o'clock? A. Sometimes around 9 or 10 o'clock. Q. I am speaking of yesterday. A. This particular time I made up my mind that my life was finished, I figured I would kill her and kill myself. Q. When you left the farm? A. Yes. Q. And then you met her? A. Yes on the road after she was walking home. Q. And she got in your car? A. Yes. Q. And you drove then? A. Yes, to where I showed you. Q. On the Salem road and you turned in then to the old road to your farm? A. Yes. Q. And then you stopped the car and you started to argue? A. Right. Q. What was the argument about? A. About fixing me some more; she was a woman to fix a man and send him to jail. Q. Did she send you to jail? A. What do you think I killed her for, just because I was crazy or something? Q. I thought you had a reason for it? A. I had many reasons, that is why I killed her. Q. What was that reason? A. Because she was going for me for my arrest and take the family away; that was my chief reason. I figured that was the last arrest she made. I am not a young man any more; I was 44 years old, and I made up my mind that she would not do it any more. You take my work records since I was a boy and you will find I have not a bad work record. Q. You stopped your car yesterday afternoon. It is

now 3 o'clock. A. According to the clock it is 3:15, another day began." . . .

"By Mr. O'Malley:

"Q. Yesterday after you picked your wife up and she was through with work you stopped your car and had an argument? A. Yes. Q. And you killed her? A. Yes. Q. How did you kill her? A. Choked her with my right hand. Q. Did you use your left hand too? A. No I can't make good use of it, it was broken and there is no strength to it. Q. You were working with both your hands in your logging business? A. Trying to. I had also broke my foot. I know exactly how I did it; I am not here to lie to you, I am not going to change it; I killed her with my hand. Q. That is the truth, is it? A. That is right, you can see. Q. Did you sign any papers after you murdered her? A. No. Q. After you murdered her? A. No. Q. Take a look at this book; it is a book made by the Agrico Company? A. Yes. Q. You wrote something in it, didn't you? A. Yes, sir. Q. When did you write it? A. After I killed her. Q. Where did you write it? A. Right at the car. Q. Would you mind reading it for us? A. Looks like to whom this may concern. You may think that a murderer is a man or woman who is out his or her mind. That is a mistake. In this particular case a lot of people think that I am a person mentally unbalance is mistaken. I have never been arrested before in my life until I married. I have no brushes with the law and I was a good citizen as any average man, but this particular bitch needed what she got. She not only destroyed my life but she destroyed my children and that is what really hurts and that is what really hurts me most. Please people I fully realize that I have left 3 poor innocent little children who know no difference but I as a so-called beastly murderer does. How my heart aches for these poor little children, but accord-

ing to my beastly wife the law says a man is only a mule. He must abide by the laws of what a woman says. Kindly be advised that what a man says before he commits a so-called murder that he is not insane. He merely went what a normal human mind can stand, yet our filthy laws says that a man is guilty. Q. You left that after you killed your wife, is that right? A. Yes. Q. You didn't choke your wife? A. Oh, yes, I did. Q. You hit her over the head. A. That was after to make sure she would not suffer. Q. What did you hit her with? A. With the hatchet, with the back of the hatchet. Q. You also hit her in the front of her face while she was on the ground. A. I choked her and as I did she turned blue black, and then spoke to her that it was the last time you had your laws at me to arrest me. Of course we were having a lot of struggles even before this time. I really didn't have in mind to kill her but what I had in mind was to reason with her but she refused; she turned for the law. Q. Is this the hatchet that you hit her with? A. That is the one, with the back end. Q. The State policeman is showing you the hatchet. A. That is the hatchet I hit her with, I tapped her with that. Q. You tapped her with the hatchet? A. That is right. Q. On the top of her head? A. Yes. Q. With the back end of the hatchet? A. Yes, sir, that is right, just that she should not suffer. Q. This was after you strangled her? A. Yes, I heard her gurgle, and why let the woman suffer when you see she is almost dead. Q. How many times did you hit her with the hatchet? A. A few times after I heard her gurgle. Q. She was lying at the time on the ground? A. Yes, I stood there choking her and she gurgled. Q. That was while she was on the ground, and that is the same place you showed Mr. Spence of the State Police where it happened? A. Yes from start to finish, there is no other place to search. Q. When you hit her

on the head with this hatchet you wanted to finish her off for good. A. I wanted to make sure she was killed. Q. Did you take this hatchet in the car today to do this job before you met her? A. Yes. Q. You never had this in your car before; you took it to make sure to finish her. A. Not necessarily. I had it in the car; there's other things in the car. I could have hit her with a wrench. There is a fourway wrench in there and there is a big cold wrench, and there is a big box wrench; there is a variety of things in the car; I didn't necessarily have to have it. Q. Where did you get the two guns, the two revolvers? A. I took one from a fellow, Jack Kumper. Q. Where does he live? A. Jefferson Township. Q. And yesterday you took the two revolvers out of your house before you met your wife? A. Correct. Q. Where were they in the house? A. In the pantry. Did the kids show you? Q. And you took these two revolvers before you met her before she came from work this afternoon? A. That is right. Q. And you had planned when you took the revolvers to kill her and yourself? A. I planned to kill myself. I thought I'd try once more to reason with her and she refused and that finished it. Q. After your quarrel you choked her and then took the hatchet from the back of the car? A. No, it was in the front of the car, and I hit her over the head and that was to make sure she isn't suffering. Q. You hit her with the back of the hatchet? A. Yes. Q. Did you wipe the hatchet off after you used it on her head? A. Yes. Q. What did you wipe it off with? A. With sand and gravel. Q. You cleaned it off? A. I kind of rested on it before I went into the car and I guess it was cleaned off by the gravel. Q. And got the blood off it? A. I don't know if there was blood on it; the blood went out of her nose and face. Q. And her face? A. Her face was covered with blood; it would be naturally after you kill someone. Q. How long did

it take you to choke her? A. I don't know, about 4 or 5 minutes; she didn't last long. Q. And when you choked her, you planned to kill her? A. Planned to reason with her. Q. When you choked her? A. At the time I was mad enough to kill anyone and to kill myself. Q. And you wanted to kill her. A. I wanted to reason with her. Q. When you were choking her? A. Yes. Q. And then you wanted to kill her? A. Yes. Q. Was her body on the ground when you hit her on the head with the hatchet? A. Yes, she didn't never move. She never moved from where she was; she was in the same location.

"I have read the foregoing statement which I have given without any promises or threats having been made to me by anyone, and willingly sign the same knowing that it may be used against me at the time of my trial." There is a signature "William Patskin", and on the left side is Norman P. McFadden, Frank M. Samek, Roger L. Spence and Joseph P. Gabriel. Then there is an addition:

"Q. William, at any time yesterday when your wife was riding with you in the car did she strike you or assault you in any manner? A. No. Q. When was the first contact, I mean physical contact, you made with your wife yesterday? A. When she was leaving the car, I grabbed her by the hand. Q. Did you still have hold of her hand when both of you were out of the car? A. I believe so. Then I believe I must have let her hand go and I must have grabbed her by the throat, my right hand at her throat and the left hand at the back of her head. I held her by the throat until she dropped and I flopped on top of her. I got up and took one look at her and then I sat in the car. I sat in the car and wrote the note in the little book. My wife was quiet until I finished the note and when she gurgled and then I reached the hatchet and got out

of the car. I hit her on the head with the hatchet. I think two times. I hit her with the hammer part of the hatchet. Q. Did you use the guns at any time during the struggle with your wife? A. The guns were on the seat the whole time and no one touched them." There is the signature "William Patskin", and the signatures on the left being Roger L. Spence, Frank M. Samek and Michael Munley. The confession was voluntary and was admitted in evidence without objection.

On the morning of May 12, 1951, defendant re-enacted the crime in the presence of the police officers.

In spite of all his admissions of this brutal murder, defendant pleaded not guilty. He did not take the witness stand; no attempt was made to deny anything; the only defense was insanity. Nevertheless, defendant alleges twelve trial errors, six of which we shall discuss.

Defendant alleges that the trial Judge erred in admitting into evidence Commonwealth's Exhibits Nos. 12, 13 and 14 which were gruesome photographs taken at the morgue which showed the victim's skull, face and head. Dr. Kubasko, the County Coroner, used these exhibits in describing to the jury the nature, extent and location of the wounds which caused Mrs. Patskin's death. There was no error or abuse of discretion in admitting the photographs: *Commonwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608. In that case the Court said (page 186) : "All of the exhibits were used extensively by the medical experts to illustrate their oral testimony. These were all proper purposes: Commonwealth v. Simmons, 361 Pa. 391, 398, 65 A. 2d 353; Commonwealth v. Peronace, 328 Pa. 86, 94, 195 A. 57; Commonwealth v. Winter, 289 Pa. 284, 289, 137 A. 261. Therefore, the trial judge did not abuse his discretion in admitting these exhibits into evidence subject to the precautionary instruction . . . that the jurors were not

to allow themselves to be prejudiced* by them but were to consider them only for the purpose for which they were offered."

In the present case the learned trial Judge gave the proper and necessarily precautionary instructions so we find no merit in this contention of the defendant.

Defendant contends that the Court erred in admitting into evidence Commonwealth's Exhibit No. 34 which was a page from a notebook of Corporal Roberts of the Pennsylvania State Police which contained the words "premeditated murder" written immediately after defendant made several oral statements or admissions which were written down by Roberts in this notebook.

On direct examination Corporal Roberts testified that the defendant said to him, "I know what I done, its premeditated murder. The dirty - - - I'd do it again". Roberts was sharply cross-examined as to whether he was sure that defendant used the words "premeditated murder". In other words, defendant sought to impeach or discredit the testimony of Roberts, insinuating that it was a recent fabrication. For this reason it was proper for the Commonwealth on redirect examination to show that Roberts' testimony was not a fabrication of recent date but something that was written by him immediately after the defendant made his oral statement. Cf. *Commonwealth v. Westwood,* 324 Pa. 289, 306, 188 A. 304; *Commonwealth v. Kay,* 14 Pa. Superior Ct. 376; *Craig v. Craig,* 5 Rawle 91, 98; *Commonwealth v. Joyce,* 159 Pa. Superior Ct. 45, 46 A. 2d 529; *Commonwealth v. Calderbank,* 161 Pa. Superior Ct. 492, 55 A. 2d 422.

---

* Practically speaking, since the defense was insanity it is more likely that the gruesome photographs helped rather than harmed defendant.

The next error complained of was permitting a Justice of the Peace to testify that Mrs. Patskin arrested her husband in 1934 for assault and battery at which time she exhibited in the Magistrate's Court big bruises and black and blue marks inflicted by him which he impliedly admitted. As corroboration the Commonwealth introduced in evidence the docket entry of this case. This evidence of beating his wife was admissible as showing, with other incidents, ill will, motive or malice which the defendant had toward his wife. *Commonwealth v. Peyton,* 360 Pa. 441, 62 A. 2d 37; *Commonwealth v. Jones,* 269 Pa. 589, 113 A. 57.

In *Commonwealth v. Peyton,* 360 Pa. 441, 452, 62 A. 2d 37, this Court said: " 'In almost any situation—whether the fact of killing is denied, or whether self-defense is pleaded, or whether it is contended that by reason of provocation the killing is reduced to manslaughter—proof of the previous relations of the prisoner and the deceased, whether friendly or hostile or whatnot, is relevant and competent'.

"In Commonwealth v. Barnak, 357 Pa. 391, 415, this Court cited with approval the case of Commonwealth v. Jones, 269 Pa. 589, 113 A. 57, in which it was held that a course of ill treatment covering years, with actual assaults, was admissible. In Commonwealth v. Crossmire, 156 Pa. 304, 27 A. 40, the Court also held that where the defendant was tried for the murder of his mother evidence was admissible showing that he frequently quarreled with her and that on one occasion he made an assault on her. They also cited Commonwealth v. Minnich, 250 Pa. 363, 95 A. 565 where it was held that 'all declarations of personal hostility are admissible in evidence as showing malice and tending to show the criminal intent charged.' "

The next error alleged concerns the Court's ruling in connection with the direct testimony of Doctor Shovelin who is the present Superintendent of Farview State Hospital. Two psychiatrists, Doctor Ginley and Doctor Shovelin, examined the defendant and testified for the defense that in their opinion from their examination and from statements which defendant made to them concerning himself that defendant was suffering from medical insanity. Doctor Ginley examined defendant five times, although on one occasion defendant refused to talk to the doctor because he thought the guards were eavesdropping. Conversations with members of defendant's family, including a sister and brother-in-law, helped the doctors form their conclusion. Doctor Ginley testified that defendant "did not know right and wrong in his delusional trend" and that he was a very dangerous mental case. The examinations conducted by each psychiatrist consisted of talking with the defendant, observing his demeanor, procuring from him a complete history of his life with particular attention to his mental aberrations and real or feigned delusions, which they repeated to the jury, and making a very thorough physical examination of the defendant. Doctor Ginley admitted on cross-examination that 75 per cent of his opinion was depended upon and was based upon what the defendant told him, i.e., his delusions. The statements which the doctor believed to be delusions were all said by the defendant after his arrest and while he was awaiting trial on the present indictment for murder. Nevertheless, Doctor Ginley said that in his opinion defendant is legally insane and was so at the time of the commission of the killing. When Doctor Ginley was cross-examined about the statement which defendant wrote between choking and the "axing" of his wife in which he called himself a beastly murderer, the doc-

tor testified that even though defendant called himself a beastly murderer he did not know the difference between right and wrong. Doctor Shovelin testified that the defendant had medical insanity; "he didn't think he could distinguish between right and wrong at the time [of the killing] because of his mental disorder". Defendant graphically and minutely described the killing of his wife to Doctor Ginley, who recited in his testimony the delusionary statements related to him by the defendant.

Doctor Shovelin agreed with Doctor Ginley that about 75 per cent of his opinion was based on what defendant told him but thereafter qualified this by saying it isn't as simple as that. A doctor's opinion "depends on the appearance of the man, what his demeanor is, how he has reacted to the situation, etc., etc." The following question and answer will illustrate the other facts upon which Doctor Shovelin based his opinion:

"Q. Do you consider the fact that William Patskin made no attempt to conceal the body of his wife or escape significant in your diagnosis? A. I thought that was very important, the method of the offense, it was a very brutal thing, not economical in the sense he didn't save any extra exertion in killing the person, he did it in a brutal and clumsy manner but he made no attempt to conceal his offense and he made no well-planned effort to escape. In fact, he turned himself over to the police or turned himself over to the son with the request that the son notify the police. It is not the type of offense that you would expect a sane person to do who was getting some personal gain and with the normal tendency to conceal something that he had done, and the normal tendency to escape from punishment."

Doctor Shovelin also procured from members of defendant's family statements concerning the defendant,* but the Court directed him (over defendant's objection) to exclude such statements in forming his opinion and restricted him to what he was told by the defendant, what he observed, what he learned from his examinations of defendant and what he heard in Court. The Court was correct in excluding statements made to the doctor by a third person: *Commonwealth v. Logan*, 361 Pa. 186, 63 A. 2d 28; *Commonwealth v. Neill*, 362 Pa. 507, 67 A. 2d 276; *McMinis v. Philadelphia Rapid Transit Co.*, 288 Pa. 377, 382, 135 A. 722; *Coyle v. Commonwealth*, 104 Pa. 117, 132. In *Commonwealth v. Logan*, the Court said, page 195: "The testimony of Dr. Cohen was based upon personal observation and examination and it was not therefore necessary to pose any hypothetical questions to him. In Coyle v. Commonwealth, 104 Pa. 117, 132 (1883), we said, 'In cases [involving] the question of insanity a medical expert may of course give his opinion based upon personal examination and knowledge of the patient; but where he is not possessed of a personal knowledge, his opinion must as we have said in Rouch v. Zehring, 9 P. F. Smith 74 "be predicated of the facts hypothetically stated," . . .' "

"A medical expert may testify as to the symptoms and sensations narrated by the patient, for the purpose of securing a correct diagnosis (Eby v. Travelers Ins. Co., 258 Pa. 525; Boyle v. P.R.T. Co., 286 Pa. 537), and is permitted to give his professional judgment as to effects produced by an accident, based on

---

* Defendant's son and daughter were permitted—and properly so—to testify that several weeks before the murder defendant mumbled to himself and while in the yard or walking along the road shook his head or waved his hand as if someone was there. Two of his sisters testified that he had fits in his youth.

his own physical examination of the injured party
(Brown v. Chester Traction Co., 230 Pa. 498), *but not
on what others have told him,*** even though fully ad-
vised as to the history of the case: Williams v. P.R.T.
Co., 257 Pa. 354; Becker v. P.R.T. Co., 245 Pa. 462."
*McMinis v. Philadelphia Rapid Transit Co.,* 288 Pa.
377, 382, supra.

The next error complained of by defendant per-
tained to the cross-examination of Doctor Shovelin.
The District Attorney asked Doctor Shovelin if de-
fendant couldn't have been faking or simulating in-
sanity. The doctor said that defendant was not simu-
lating insanity because the average individual does not
know much about it and consequently can't fake it;
and the doctor can detect malingering. The doctor
continued his testimony as follows:

"Secondly, if I may go on, I can support my opin-
ion that this man isn't malingering by other factors.
Another factor, if he is released from the guilt because
of insanity, in this instance he knows he is going to a
mental hospital. Q. Who told him that? A. I don't
think anybody. He realizes that. Q. Who told him
that? A. He has enough sense to know that. Q. Who
told him that, do you know? A. He discussed that
with me and spoke to me, 'If there is something wrong
with my mind'. That is his feeling about it. Q. I ap-
preciate that. What else, Doctor? A. If he went to
a mental hospital, in all probability he will remain
there the rest of his life.

"The Court: Is that necessarily so? Q. By Mr.
O'Malley: There is a lot of people in your institution—
Q. By The Court: How about Ziemba? What was the
diagnosis in his case? A. Your honor, I don't think
he was charged with murder. Mr. O'Malley: He was

---

** Italics throughout, ours.

charged with murder—The Court: Don't tell me you don't know the facts behind his case.* Mr. Casey: I don't think it is relevant in this particular case."

The Court did not commit reversible error. The Act of March 31, 1860, P. L. 427, Sec. 66 as Amended, 19 PS, Sec. 1351 provides that if a defendant is acquitted of any crime on the ground of insanity the Court ". . . shall have power to order him to be kept in strict custody, in such place and in such manner as to the said court shall seem fit . . . *so long as such person shall continue to be of unsound mind.*" The doctor gratuitously (and we assume unintentionally) gave the jury a wrong impression when he said that in all probability defendant knew he would remain in a mental hospital the rest of his life. As the Court en banc said in its opinion: "The Court was merely trying to correct the false impression left with the jury by the Doctor witness and, in our opinion, had not only the right but the duty to do so: Commonwealth v. Carluccetti, 369 Pa. 190." The following language in the opinion in *Commonwealth v. Carluccetti,* is particularly appropriate where, as here, the defendant contended that the Court's inquiry of the doctor prejudiced his testimony. "If such were the effect of the court's interpolations, it was more than the witness himself had invited. The learned trial judge did not abuse his discretion. In Commonwealth v. Myma, 278 Pa. 505, 507, 123 A. 486, where the appellant in a capital case contended that the 'trial judge unduly questioned . . . a number of witnesses to his prejudice', this court said that 'A judge in a jury trial has a right to interrogate witnesses. It sometimes becomes his duty to do so, even to the point of recalling a witness to supply an omission of

---

* Dr. Shovelin had recently recommended a discharge of Ziemba after his incarceration in Farview.

proof on a material point. . . .' " We agree with the position of the Court below: *"The purpose of a criminal trial is to ascertain the truth* and it is the business of the Trial Judge to see that this end is obtained even if it necessitates his interrogation of witnesses to clear up some doubtful fact."

The Trial Judge did not abuse his discretion under the circumstances here present.

Defendant next contends that it was basic and fundamental error for the Trial Judge to fail to instruct the jury that it could find the defendant not guilty. The charge of the Court was lengthy, clear and exceptionally able. First and second degree murder and manslaughter were aptly defined; reasonable doubt was clearly explained at length; the jury was told about the presumption of innocence; the jury was told that the defendant has the burden of proving insanity by a fair preponderance of the evidence, but the burden of proof never shifts in that the Commonwealth upon a consideration of all the evidence must prove that the defendant was guilty beyond a reasonable doubt, and that if there was a reasonable doubt the defendant must be acquitted. *The jury was told three times that they could acquit the defendant.* The jury was told many times that they and they alone were the sole judges of the truth and of the facts and that it was their opinion and not the Court's which was to govern. The Court also said: "The defendant claims that he is not guilty of any degree of murder because of legal insanity." The Court also affirmed one of defendant's points for charge which read as follows: "2. If you find, by the fair weight and preponderance of the evidence, that the defendant, William Patskin, was insane within the legal meaning of the term, at the time of the commission of the offense, your verdict must be not guilty by reason of insanity."

At the conclusion of the charge which covered 40 pages of printed record, the Court asked whether there were any corrections or additions to his charge. Thereupon counsel for defendant said: "If the court please, as a general proposition, I think the jury ought to have the right to find a verdict of not guilty." The Court then said to the jury: "Under the evidence in this case, if you find this defendant not guilty it must be by reason of insanity. The court cannot see how you could arrive at any other conclusion." Counsel for defendant must have been satisfied for he made no further request and took no exception to this part of the charge.* Nevertheless on appeal he vigorously contends that this was reversible error.

The Act of March 31, 1860, P. L. 427, Sec. 66, as amended by the Act of April 17, 1929, P. L. 532, Sec. 2, 19 PS, Sec. 1351, provides: "In every case in which it shall be given in evidence upon the trial of any person charged with any crime or misdemeanor, that such person was insane at the time of the commission of such offence, and he shall be acquitted, *the jury shall be required to find specially whether such person was insane at the time of the commission of such offence, and to declare whether he was acquitted by them on the ground of such insanity*; and if they shall so find and declare . . ." Under all the facts and the evidence in this case, if the defendant was found not guilty, the Court below was justified in saying that it could not see how the jury could arrive at such a verdict unless it was by reason of defendant's insanity.

It is well to recall that the defendant several times orally and once in writing, confessed to the police that he killed his wife; the defendant told his son, who was

---

* Counsel for defendant later on took a general exception to the charge.

one of his witnesses, that he had killed his wife; the defendant told Doctor Ginley, one of his expert witnesses, graphically and in great detail how he killed his wife; the defendant reenacted the murder; counsel for defendant at the commencement of the case and throughout the case asserted that the defense was insanity; the defendant never took the witness stand and the only defense presented or argued on his behalf was insanity.

In *Commonwealth v. Chambers*, 367 Pa. 159, 79 A. 2d 201, this Court said, (page 164) : "It is the exclusive province of the jury, not the court, to decide all the facts, the inferences therefrom, the credibility of the witnesses and the weight and effect to be given to all of the testimony. While the main purpose of a judge is to state and explain the law and briefly review the evidence, it is always the privilege and sometimes the duty of a trial judge to express his own opinion, including his opinion of the weight and effect of the evidence or its points of strength and weakness or even the guilt or innocence of the defendant and the verdict which, in his judgment, the jury should render, provided (1) there is reasonable ground for any statement he may make; and (2) he clearly leaves to the jury the right to decide all the facts and every question involved in the case, regardless of any opinion of the court thereon: Commonwealth v. Cunningham, 232 Pa. 609, 611, 81 A. 711; Commonwealth v. Foster, 364 Pa. 288, 293, 72 A. 2d 279; Commonwealth v. Simmons, 361 Pa. 391, 407, 65 A. 2d. 353; Commonwealth v. Watts, 358 Pa. 92, 97, 56 A. 2d 81; Commonwealth v. Jones, 341 Pa. 541, 551, 19 A. 2d 389; Commonwealth v. Nafus, 303 Pa. 418, 420-1, 154 A. 485." .

In this case the Court in its charge clearly and repeatedly told the jury that it had the right to decide all the facts and every question involved in the case

regardless of the Court's recollection or opinion thereon.

Moreover, this Court has said many, many times: ". . . a Judge's charge must be considered in its entirety and that error cannot be predicated on certain isolated excerpts from the charge. See Com. v. Malone, 354 Pa. 180, [47 A. 2d 445]; Com. v. Glenn, 321 Pa. 241, [183 A. 763]; Com. v. Bryson, 276 Pa. 566." *Commonwealth v. Moyer*, 357 Pa. 181, 187, 53 A. 2d 736. See also to the same effect, *Commonwealth v. Almeida*, 362 Pa. 596, 600, 68 A. 2d 595, *Commonwealth v. Thompson*, 321 Pa. 327, 184 A. 97; *Miller v. P. R. R.*, 368 Pa. 507, 515, 84 A. 2d 200. When the Court's charge is read and considered as a whole it is clear that there is no merit in defendant's contention.

The next contention of the defendant is that it was prejudicial error for the District Attorney to state to the jury that the Commonwealth had no right to ask for an examination of the defendant after the trial had started. This alleged error was raised in defendant's reasons for a new trial but was not argued before the Court en banc. Counsel for defendant in his argument to the jury repeatedly asked why the Commonwealth did not have the defendant examined by a psychiatrist before the trial. The District Attorney said in reply: "We did not know until this trial on Monday of this week that the defendant's defense in this case was insanity and once this trial started we had no right to ask for an examination of the defendant." The District Attorney learnéd for the first time when defendant was examining the prospective jurors on their voir dire that the defense was to be insanity and did not believe he had a right under The Mental Health Act of July 11, 1923, P. L. 998, as amended by Act of May 28, 1937, P. L. 973, 50 PS, Sec. 48, to ask for a psychiatric examination after the trial

had started. It is doubtful whether counsel for defendant was justified in his remarks; it is equally doubtful whether the District Attorney was justified in his reply. In any event, the remarks of the District Attorney fall within the rule stated in *Commonwealth v. Crittenton*, 326 Pa. 25, 191 A. 358, and are not so prejudicial as to warrant a reversal or justify a new trial. The defendant's actions, statements and confessions—even without the corroborating testimony of the Commonwealth's expert witnesses and lay witnesses—wholly refute the opinion evidence of defendant's expert medical witnesses. As Justice (now Chief Justice) STERN said in *Commonwealth v. Heller*, 369 Pa. 457, 461, 462, 87 A. 2d 287: ". . . defendant's actions in the present case, speaking louder than his words, wholly refute the opinion evidence of the expert medical witness. . . ." In this case the jury must have believed, as we do, that the delusions were concocted by the defendant for the trial. Defendant's doctors based their opinion of insanity 75 per cent on defendant's alleged delusions and placed great reliance upon the fact that defendant did not hide the body; that the killing was brutal and uneconomical; that defendant readily gave himself up; and showed no remorse or sense of guilt for having killed the woman he hated. If evidence such as this were sufficient to prove legal insanity and to prevail over acts and statements clearly evidencing sanity, few "murderers" would ever be convicted.

We have carefully considered all the other contentions of the appellant but finding no merit therein deem discussion thereof unnecessary.

We are absolutely convinced from reading the entire testimony that the jury's verdict was just and proper and therefore:

The judgment and sentence of the Court of Oyer and Terminer are affirmed.