Commonwealth *v.* Bibalo, Appellant.

Argued September 28, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Patrick J. Sheridan,* with him *Morton W. Stephens,* for appellant.

*Robert G. Dean,* District Attorney, Susquehanna County, for appellee.

OPINION BY MR. JUSTICE ARNOLD, November 9, 1953:

A jury found the defendant guilty of murder in the first degree and the death penalty was imposed. The only defense presented was legal insanity.

The verdict established the following facts: The defendant, 20 years of age, was making his home with his grandmother at Uniondale, Susquehanna County, and had been visiting his mother at Simpson, Lackawanna County, just previous to December 10, 1951. At about nine o'clock in the morning of that day he left her home and went to Forest City, Susquehanna County, where he arrived at about 10:00 o'clock A.M.

He then went to a beer garden and had at least four drinks and began "hitch-hiking" his way to Uniondale. The victim, Anthony Shema, of Forest City, picked up the defendant. While travelling the defendant asked Shema if he were going hunting and upon receiving an affirmative answer, told him he knew of a good place to hunt, and the victim asked him to go along. In his confession the defendant said that at this time ". . . I thought that would be a good time to shoot him, while hunting, and I could get his car." They drove to the home of defendant's grandmother where defendant alighted, went into the house and came out with a 22 caliber rifle. They walked into the woods until they came to a stone wall, where both of them sat down. They were watching for deer and at that time, as stated by defendant in his confession, "I was again thinking about having the car, so I aimed the gun at his head and pulled the trigger. He then fell off the wall and I walked over to him and I saw that he was still living, so I took the gun by the barrel and hit him over the neck, the back of the neck, and I hit him about five times until the gun broke. I guess he was dead then, so I took the parts of the gun and threw them over the wall. I then pulled his gun from under him and reached into his watch pocket and took the keys for his car and took five shells from his hunting coat."

Shortly after the killing the state police were requested to investigate a report of a missing hunter known as Anthony Shema of Forest City. The officers made inquiries at Forest City and later sent out a teletype message describing the missing hunter and his automobile. They learned that a postal clerk had seen a person driving a car similar to Shema's and that the driver had had difficulty with it. Upon receiving a description of the vehicle and the operator,

and after further inquiries, the police officers became suspicious of the defendant and went to his grandmother's home. The defendant was not there, but later the officers made the arrest. Defendant then led them to the spot where the body of Anthony Shema was found and showed them where he had thrown the parts of the gun, which he identified. The victim's car, with its license tags removed, was found in New York state near the Pennsylvania state line. The defendant stated that he had abandoned the car and removed the license plates to hide the identity of it. He made an oral confession at the time of his arrest and later signed a written statement before a justice of the peace. He then made a second trip to the scene of the crime with the officers and the coroner. The coroner's examination of the body disclosed that underneath the victim's collar a deep laceration appeared across the back of the neck. The defendant was asked about this and said that he had inflicted the cut with the victim's own knife, and later stated that he "tried to cut the head off so the body could not be identified, so he could hide the head."

We have reviewed both the law and the evidence to determine whether the ingredients necessary to constitute murder in the first degree were proved to exist: Act of 1870, P. L. 15, §2, 19 PS §1187. Beyond any doubt these elements were proved to exist.

On the question of whether or not the defendant knew the difference between right and wrong (which is the test of legal insanity), two qualified psychiatrists for the defendant, Dr. Claude R. Young and Dr. Francis M. Ginley, testified that in their opinion the defendant did not know the difference between right and wrong, nor did he know the consequences of his act at the time he committed it. Dr. Young testified that the defendant was a "low grade moron" (being

of a mental age of eight to nine years) ; and according to Dr. Ginley he was a high grade moron of 10 to 11 years. The rest of their testimony had to do with the history of the defendant as related by lay witnesses, which they took into consideration.

The Commonwealth called Dr. John Shovlin who was superintendent of the Farview State Hospital for the Criminal Insane. He expressed the opinion,—and he was well qualified,—that the defendant did know the difference between right and wrong, that although he was mentally defective, he was not so defective that he did not know what he was doing; and that he knew the nature and quality of his act and the consequences of it. He testified that defendant's I. Q. was determined to be 75, and that the normal ranges being from 90 to 110, the probable average would be 87.[1] He further stated that it would be difficult to express an opinion that the defendant was a low grade moron or a high grade moron. In his opinion the defendant was somewhere between a low grade and a middle grade moron with mental age between 9 and 10 years, was not insane, and could not be placed in the Farview State Hospital.

The fact that the defendant had been committed to the Pennsylvania Institution for Defective Delinquents at Huntingdon; that he had had one leg shorter than the other until he was some eleven years of age; and that he was somewhat of a problem child, are, at the most, matters which may aid the expert in pronouncing his final judgment,—that is, whether the defendant knew the difference between right and wrong. The question of whom the jury should believe was ex-

---

[1] He stated that "the basis of one hundred is actually too high . . . . So a probably just average would be eighty seven, based on one hundred".

clusively for it, and this question was resolved against the defendant.

On this state of facts unquestionably the court was not required as a matter of law to reduce the sentence from death to life imprisonment merely because the defendant was unstable and either a moron or a mental defective. See *Commonwealth v. Elliott,* 371 Pa. 70, 89 A. 2d 782, where the defendant had a low mental level and had been three times sent to correctional institutions.

We next pass to the additional contentions of the appellant.

(1) The first relates to the court's admitting in evidence a written confession made by the defendant. The written confession was preceded by an oral confession which was already in evidence. They were obtained without threat or inducement that might secure a false confession. The mere fact that the defendant was in custody when he made the confessions did not make them any less voluntary: *Commonwealth v. Spardute,* 278 Pa. 37, 48, 122 A. 161; *Commonwealth v. Smith,* 374 Pa. 220, 97 A. 2d 25. The case of *Turner v. Pennsylvania,* 338 U. S. 62, is not in point, for in that case the confession was obtained as a result of interrogation by relays of police officers constituting mental torture or pressure to such an extent as to exclude the voluntary element in the confession, making it rather an eventual yielding to the continuous pressure of questioning and breaking down the resistance of the defendant. In the instant case the defendant was not threatened and no one hovered over him. He was simply asked what he did and why. The fact that he had no counsel does not invalidate the confession: *Commonwealth v. Agoston,* 364 Pa. 464, 72 A. 2d 575; *Commonwealth v. Smith,* supra. There is no evidence that the defendant was at any time motivated

by fear. On the contrary the evidence discloses the fact that he was unafraid. Both confessions were voluntary and were clearly admissible.

(2) The defendant attacks the admission of a photograph of the deceased on the ground that it was especially designed to arouse the jurors' emotions. In the first place, in a homicide case the admission of photographs showing the body of the deceased is largely within the discretion of the trial court, and an error will not be predicated by this Court on the admission of such exhibits unless there is a flagrant abuse of the discretion. Commonwealth's exhibit was not gruesome, was necessary to the Commonwealth's case to explain the size and nature of the cut on the deceased's neck and the violence of defendant's attack upon him, and also as a visual aid to show that the defendant attempted to remove the decedent's head to prevent identification. The court below warned the jury against prejudice because of the photographs. " 'All that the law requires is that photographs should not be introduced merely for the purpose of exciting the emotions of the jurors, but only where they are helpful in aiding them in their investigation of the crime and the defendant's guilt, and that purpose should be carefully explained to them. The matter is one for the exercise of the trial judge's discretion.' ": *Commonwealth v. Davis,* 363 Pa. 91, 95, 69 A. 2d 123. See also *Commonwealth v. Patskin,* 372 Pa. 402, 411, 93 A. 2d 704.

(3) Defendant complains that the trial court erred in overruling defendant's challenge for cause, which was based upon the relationship of juror No. 11 to the deceased. The juror in question stated on her voir dire that she was related to the deceased but she did not know the degree, nor is it clear that she knew the deceased. She was clearly impartial. The

court below held that the matter was too remote and refused the challenge for cause. Defendant did not exhaust his peremptory challenges, and therefore he cannot complain that the court refused his challenge for cause: *Commonwealth v. Spahr*, 211 Pa. 542, 60 A. 1084. In addition, nothing short of palpable error will justify reversal of a trial judge in passing on a challenge for cause: *Commonwealth v. Sushinskie*, 242 Pa. 406, 413, 89 A. 564.

(4) We have examined carefully the defendant's position that the trial court erred in his charge to the jury on the burden of proof of insanity. We have read and re-read the charge and we find no error in it. Instead we find the charge to be most fair and accurate.

(5) The defendant contends that the court's charge was improper in regard to expert testimony. But here again the judge was calm and dispassionate. The question was: which set of experts should be disbelieved, the defendant's or the Commonwealth's? It is not how many pages of the charge were occupied with the review of defendant's expert testimony as compared with the number of pages of the transcript of the examination and cross-examination of defendant's experts. The court below stated succinctly what each of the experts testified. Keeping in mind that the question was whether the defendant knew the difference between right and wrong, no fair objection can be raised to the court's charge. We might also add that not even a general exception was taken to the charge, nor did the defendant ask for a more detailed exposition.

(6) The next contention of the defendant has to do with the court's expression of opinion to the jury, both as to the guilt of the defendant and as to the proper penalty. This portion of the charge is in the following words: "And we say to you, members of the

jury, at this point, that *if* you are satisfied beyond a reasonable doubt from all of the evidence in this case, *if* the Commonwealth has proven to you beyond a reasonable doubt from all of the evidence in this case, that this defendant unlawfully, maliciously, wilfully, premeditatedly and of his malice aforethought did kill and slay Anthony Shema, or unlawfully, feloniously, and maliciously did kill and slay Anthony Shema while in the act of perpetrating the felony of robbery, and there are no extenuating circumstances, it is our opinion that your verdict should be 'guilty of murder in the first degree.' And if the defendant was sane and knew the consequences of, and the quality of his act, knew the difference between right and wrong and there are no extenuating circumstances, it is our opinion that he should receive the maximum penalty. *However members of the jury, you must determine that at your discretion. You must not permit the opinion of the Court to influence you as it is only my opinion."* (Italics supplied). Thus the defendant was fully protected. The court then charged the jury that "if you find this defendant guilty of murder in the first degree, you may consider the proof in insanity, *which, even though it may not substantiate the charge of insanity,* it may be sufficient to convince you that there are circumstances which would justify you in not administering the death penalty." (Italics supplied). These portions of the court's charge were unimpeachable.

Nobody could deny that the defendant committed a cruel and heartless murder. The trial judge merely said to the jury that if it believed the Commonwealth's expert, the penalty should be death if there were no extenuating circumstances. He then directed the jury to determine that issue at its discretion and stated the opinion of the court was not to influence its verdict

as it was only the court's opinion. He may express his opinion as to the guilt or innocence of the defendant provided this is done fairly and not arbitrarily, and provided he does not give a binding direction or interfere with the province of the jury. See *Commonwealth v. Sykes*, 353 Pa. 392, 398, 45 A. 2d 43; *Commonwealth v. Edwards*, 318 Pa. 1, 178 A. 20; *Commonwealth v. Gable*, 323 Pa. 449, 187 A. 393; *Commonwealth v. Simmons*, 361 Pa. 391, 407, 65 A. 2d 353.

(7) It is next contended that the court erred in not instructing the jury that the testimony of all the psychiatrists should not be taken as factual, but should go only to testing the mentality and sanity of the defendant. This refers to the statement of Dr. Ginley on cross-examination that the defendant told the witness that he wanted to go to the electric chair. The question asked of Dr. Ginley on cross-examination was not objected to, nor was any motion made to strike out the answer. Furthermore, the defendant did not even call this matter to the attention of the court after the charge. In addition, the alleged omission to charge on this was not prejudicial to the defendant. In fact, it is indicated that defendant's counsel were satisfied that the answer the defendant gave the doctor would indicate insanity (that he wanted to go to the electric chair and not be institutionalized). Under the circumstances this cannot call for reversal. See *Commonwealth v. Carelli*, 281 Pa. 602, 127 A. 305; *Commonwealth v. Winter*, 289 Pa. 284, 137 A. 261; *Commonwealth v. Mendola*, 294 Pa. 353, 144 A. 292.

(8) Before the jury entered into its deliberations, one of the jurors sent a note to the trial judge as follows: ". . . *If* a verdict of 1st degree is brought in and life imprisonment recommended will the defendant be eligible for parole after *any* length of time? No one but me knows that I am asking this question. Thank

you. [Signed] J. Donlevy." The note was a private communication of this juror requesting information whether the defendant, if given life imprisonment, could ever be paroled. That was none of the jury's affair and it could not be considered by it. Had the note come from the jury, it would have been so informed. See *Commonwealth v. Mills*, 350 Pa. 478, 39 A. 2d 572; *Commonwealth v. Patskin*, 372 Pa. 402, 93 A. 2d 704. The court determined that "it was not proper, either to discuss the matter privately with him, or bring it to the attention of the jury by discussing it with him before them all. We anticipated that the question might arise during the jury's deliberation and that if this proved to be the case, we would in all probability receive a request for further instructions on this point. Apparently it never entered into their deliberations." The defendant was not harmed.

We have carefully examined the record and it is clear beyond the shadow of a doubt that the court below very painstakingly tried this case in a most impartial manner, and carefully safeguarded all the rights of the defendant. The facts were completely against the defendant, and under the court's unbiased charge the verdict of guilty, fixing the penalty at death, should not be disturbed.

Judgment of sentence affirmed.