## Commonwealth *v.* Rosenblatt, Appellant.

Argued September 27, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Louis Lipschitz,* for appellant.

*Christopher F. Edley,* Assistant District Attorney, with him *Victor Wright,* Assistant District Attorney, *Vincent G. Panati,* First Assistant District Attorney, and *Samuel Dash,* District Attorney, for appellee.

OPINION BY WRIGHT, J., November 16, 1955:

Morris Rosenblatt was brought to trial in Philadelphia County on ten bills of indictment (March Sessions 1954) as follows: Nos. 1356, 1364, and 1365 charging the unlawful conveying of drugs into a prison, No. 1357 charging conspiracy, Nos. 1358, 1359, and 1360 charging unlawful possession of drugs, and Nos. 1361, 1362, and 1363 charging the unlawful delivery of articles to convicts in a penal institution. Demurrers were sustained as to Nos. 1358, 1359, and 1360. The jury returned verdicts of guilty as to the other seven bills. Motions for a new trial and in arrest of judgment were overruled. Rosenblatt was sentenced on bill No. 1356 to undergo imprisonment at the Eastern State Penitentiary for a term of not less than two nor more than four years. A similar sentence was imposed on bill No. 1365 to begin at the expiration of the sentence on bill No. 1356.[1] These appeals followed.

The Commonwealth's evidence is summarized in the following excerpt from the opinion of Judge WATERS for the lower court:

"The defendant, while in charge of the mattress shop at the House of Correction, was requested by one Henry Murdock, an inmate serving a term of one year for the use of drugs, to procure for him and bring into the prison powdered nutmeg. Beginning in November and December of 1952, the defendant brought in and delivered to Murdock four or five cans of the nutmeg powder for which defendant was paid fifty cents a can and two dollars for his services on each occasion.

"Murdock distributed the nutmeg powder among other inmates confined as drug addicts. The powder was taken with water by the inmates and certain sen-

[1] Sentences were suspended on the other five bills.

sations were had by its use. This practice continued at irregular intervals until July 1953 when Murdock was released.

"In the fall of 1953 Murdock was returned to the House of Correction and just before Christmas of 1953, the defendant was requested to bring in some heroin by Murdock who collected from other inmates twenty dollars, fifteen of which was for the drug and five dollars of which was for the defendant's services. On the following day, a brown manila envelope was delivered containing a white powder which certain inmates used by injection and from which use the same results were experienced as when heroin was formerly injected. Murdock, however, did complain to the defendant that the drug was weak and the defendant, the next day, brought in eight or ten 'goofballs', a phenobarbital compound, to take care of the complaint.

"Later in January of 1954, a second delivery of heroin was made to Murdock by the defendant under the same circumstances, except that the price was raised at the insistence of the defendant that he receive ten dollars for himself instead of five dollars. Again the drug was delivered in a brown manila envelope like a pay envelope and it was used by needle by Murdock and other inmates, and the same experience was had from its use as when heroin was previously used on the outside.

"Under somewhat similar circumstances another inmate, Andrew Henry, who was also confined to the House of Correction for the use of narcotics, arranged with the defendant to bring heroin into the institution. In this instance the procedure agreed upon was to have one Benjamin C. Bell, another convict about to be released from the House of Correction, procure the heroin on the outside and deliver it to the defendant who, in turn, would bring the drug into the institution, for

which services the defendant was to be paid ten dollars in addition to the cost of the drug.

"Bell was released on Friday, January 22, 1954, and just prior thereto he told Henry that if he could get someone to stop at his house he would give that person some heroin to bring into the House of Correction. Bell testified that he, Andrew Henry, and the defendant had a conversation in which arrangements were made for the defendant to stop at Bell's house to pick up heroin. At the meeting with the defendant Bell gave him his address and on Saturday, January 23, 1954, the defendant came to Bell's house, asked him if he had the 'stuff'. Bell explained he did not at that time, and the defendant drove Bell to a source of supply but contact was not made on that Saturday afternoon. The two parted after Bell told the defendant to come to his house the following day, Sunday. On Saturday evening Bell did make a purchase of heroin i.e. of a white powder that was sold to him as heroin. On Sunday defendant again came to Bell's house, the package was given to him and on the next day, Monday, the defendant delivered the package to Henry in the House of Correction. Bell's wife, Lillian, saw the defendant with her husband on their porch on Saturday and in the dining room on Sunday.

"The contents of the package consisted of the equivalent of about six number five capsules, or enough for 'two or three fellows to get high on'. Henry injected the drug into his arm, as did a fellow convict, Vincent Lorenzo, and Henry 'got high' just as he would in the street if he were 'copping off the corner, copping heroin off the corner'. Vincent had a similar sensation after injecting the drug".

Counsel for appellant concedes "that there may have been enough evidence in the record which, if believed, would be sufficient to convict the defendant".

He contends, however, that because of four alleged trial errors, it is imperative that a new trial should be granted. We are not in agreement with his position in this regard.

Appellant's first contention is that "the trial judge permitted redirect examination of the Commonwealth's witnesses to show that they made accusations against the defendant in his presence, without any affirmative showing by the Commonwealth as to any failure of the defendant to deny the accusations and that denial was called for by the circumstances". This complaint misinterprets the purpose of the testimony in question and the basis for its admission. An attempt was made by appellant's counsel upon cross-examination to show that Bell, Henry, and Murdock met together and fabricated a story incriminating Rosenblatt. It was therefore proper for the Commonwealth on redirect examination to show that their testimony was not a fabrication of recent date: *Commonwealth v. Patskin,* 372 Pa. 402, 93 A. 2d 704. And see the discussion of the admissibility of prior consonant statements by President Judge RICE in *Commonwealth v. Kay,* 14 Pa. Superior Ct. 376. The testimony in the case at bar was not received as an implied admission by Rosenblatt under the rule of *Commonwealth v. Vallone,* 347 Pa. 419, 32 A. 2d 889. His presence at the time was an incidental circumstance not unduly emphasized. The matter of his acquiescence or denial was not inquired into. That any inference could be drawn against him under the circumstances was not the subject of argument or charge.

Appellant's second contention is that "the trial judge permitted the assistant district attorney to press the appellant on cross-examination for an explanation of why the Commonwealth's witnesses would lie in their testimony, if the defendant was to be believed".

It should be noted that the cross-examination in this connection was preceded in at least one instance by appellant's reference to the testimony of the witness in question as "an absolute lie". While this form of impeachment should not be encouraged, we feel that it is within the sound discretion of the trial judge to determine whether or not, in trial context, it is prejudicial. Our examination of the record does not disclose any abuse of this discretion.

Appellant's third contention is that "the trial judge permitted cross-examination of the defendant and affirmative contradictory evidence by the Commonwealth on a collateral matter". On direct examination appellant testified as follows: "Q. Did you ever bring anything in the House of Correction. A. No, sir. Q. Any kind of contraband. A. No, sir.". On cross-examination, the prosecuting attorney repeated the same question as follows: "Q. Sir, you say you never brought contraband into the House of Correction. Is that correct? A. That's right". Appellant was then questioned concerning a prior suspension of five days for furnishing cigarettes to a female inmate. The Commonwealth subsequently attempted to elicit information from the prison superintendent concerning this suspension. Because of a timely objection, no "affirmative contradictory evidence" was actually received. Appellant's counsel relies upon *Commonwealth v. Petrillo*, 341 Pa. 209, 19 A. 2d 288, and *Commonwealth v. Graham*, 170 Pa. Superior Ct. 343, 85 A. 2d 632. While these cases stand for the proposition that a witness may not be contradicted on collateral matters merely to test his credibility, we do not consider them controlling in the circumstances here presented. As previously indicated, appellant himself opened the door to the introduction of questions concerning the collateral matter of which he complains. A defendant

should not be permitted to make a general denial to suit his own advantage, and then complain that, in questioning his generalization, the Commonwealth is introducing a collateral matter.

Appellant's fourth and final contention is that "the trial judge charged the jury that the appellant had been indicted for a crime for which no indictment had actually been found against the defendant". Appellant's complaint in this regard is directed against an excerpt from the charge set forth in the footnote.[2] He argues that the trial judge erred in calling the attention of the jury to that portion of the Act of June 24, 1939, P. L. 872, section 621, 18 PS 4621, which makes delivery of "any letter, note, money or contraband goods of any kind" into or out of a penal institution a misdemeanor; whereas the language of bills Nos. 1361, 1362, and 1363 was based only on section 622 of

---

[2] "The charges against this defendant also include what the Commonwealth charges, and that is the violation of certain sections of our penal code, and these sections, so far as they apply to the particular charges in this case, briefly provide that whoever sells, gives, or furnishes to any convict in a prison or inmate in a mental hospital, or gives away in or brings into any prison, mental hospital, or any building appurtenant thereto, a drug, medicine, or other kind of narcotic, is guilty of an offense against the Commonwealth and the peace and order of our community.

"And the penal code goes further and provides that whoever delivers or procures to be delivered or has in his possession with intent to be delivered to a convict of any penal institution in this Commonwealth any letter, article, or thing, with the intent that a convict confined in the institution shall obtain or receive the same, is guilty of a misdemeanor; or whoever brings into or takes into any penal institution any letter, note, contraband goods of any kind, except after inspection and under the rules and regulations of the institution, is guilty of a misdemeanor.

"The Commonwealth charges that this defendant did violate these sections of the penal code, in accordance with the evidence which has been presented to you".

the statute (18 PS 4622). It is sufficient in this connection to point out that the bills in question actually charged a violation under section 621 as well as under section 622. The words "contraband goods of any kind" as used in section 621 are broad enough to include the words "any letter, article, or thing" as used in section 622. See *Commonwealth v. Ginsberg*, 143 Pa. Superior Ct. 317, 18 A. 2d 121. Appellant relies upon *Commonwealth v. Charen*, 177 Pa. Superior Ct. 522, 111 A. 2d 155. In that case the indictment charged in the language of the second offense set forth in section 513 of the Act of June 24, 1939, P. L. 872, 18 PS 4513, which section actually classified eight different offenses. The trial judge read to the jury the language of the section which also defined the first and third offenses, for which the defendant had not been indicted. We held that it was error to read those portions of the section which did not define the crime charged. The *Charen* case does not control the situation here under consideration. In any event, the instant appeals relate only to bills Nos. 1356 and 1365, which charge a violation of section 620 (18 PS 4620) prohibiting the conveying of drugs into prisons. It is entirely clear that, on these two bills, appellant was not convicted of offenses for which he was not indicted.

The judgments are affirmed, and it is ordered that appellant appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with his sentences or any parts thereof which had not been performed at the time the order of supersedeas was entered.