494 A.2d 1054

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Frederick HAMMER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 7, 1984.

Decided June 27, 1985.

92

Andrew G. Gay, Philadelphia, for appellant.

Robert B. Lawler, Richard Goldberg, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is a direct appeal from the entry of judgment of sentence of murder of the third degree against appellant Frederick Hammer arising from the death of an off-duty Philadelphia police officer, Charles Uffelman. The appellant alleges that the conduct of the trial judge in conducting extensive and repeated examination of witnesses, including the defendant, acted ofttimes in the role of advocate for the prosecution in violation of *Commonwealth v. Myma*, 278

Pa. 505, 123 A. 486 (1924) and exhibited incredulity of the defendant's testimony in violation of *Commonwealth v. Williams*, 468 Pa. 453, 364 A.2d 281 (1976). We agree and accordingly reverse and remand for a new trial.

Proof adduced at trial was that the dead body of the victim, Charles Uffelman, was found on the sidewalk of Delaware Avenue in Philadelphia on Friday, October 13, 1978. The victim's blood alcohol content was determined to be .18 and vomit was on the sidewalk near the victim as well as on the cuff of the victim's trouser. The Commonwealth's case was based on the theory that the appellant, who had walked a lengthy distance in trying to reach the Philadelphia International Airport, was looking for a car to steal and at approximately 8:00 in the evening, after walking for approximately 3 hours, he reached Delaware Avenue where he came upon Uffelman.

The Commonwealth sought to prove that Uffelman had pulled his car over to the curb and was crouched over to vomit, having been drinking since 4:00 p.m. It was theorized that appellant, viewing this as an opportunity to steal a car, struck Uffelman over the head with a 4 inch square, 4 foot long piece of old lumber lying nearby as Uffelman was crouched over.

The defense presented consisted of testimony by several expert witnesses and the testimony of the defendant. Frederick Hammer was 18 years old at the time of the incident and lived approximately one and one-half hours driving time from Philadelphia, but was in Philadelphia that day to do a carpentry-type job with his brother and a co-worker on a building roof. During the job, scaffolding upon which they stood collapsed and appellant fell, whereupon he was transported to a local hospital by a rescue squad but released after examination determined that he was merely bruised. Appellant testified that he had less than a dollar and that after waiting for approximately three hours at the hospital in the expectation that his brother would retrieve him, he called his stepfather and was advised to get public transportation to "center city" and call his stepfather again once he

had an address. Appellant testified that he believed that he did not have enough money to take a bus and that he began walking beneath the elevated train after receiving direction from a police officer regarding the general direction of the airport. He testified that he decided to go to the airport because he thought that it was "center city" and also knew his stepfather would be able to easily find the airport. He himself was familiar with the airport location both because the route from his home to Philadelphia passes the airport complex and because during a period he served in the Navy he was briefly located at the Philadelphia shipyard which is close to the airport.

He testified that he had underestimated the distance to the airport and that after walking for over three hours he had reached Delaware Avenue where the driver of a passing car stopped to ask him if he needed a ride. He explained that his destination was the airport and accepted the offered ride. He testified that the driver, decedent Uffelman, made a homosexual proposition and advance, offering the appellant money and that when appellant refused, the driver became angry, violent and held a gun on appellant. He then allegedly pulled the car to the curb, began to quickly walk around the front of the car, saying "We'll see what you're made of," and then grabbed at appellant's chest through the car window. After appellant was forced to get out of the car, he picked up the post used as a weapon, and while approximately facing decedent, swung and struck the decedent who then fell to the ground. Appellant then went to the driver's side of the car, got in and drove away.

Approximately an hour later, he was stopped for speeding on route to his home by two Pennsylvania State Troopers. When he repeatedly presented false identification, which he held in order to be served liquor, he was ordered out of the car and frisked. He was wearing an old Navy issue shirt, on which his last name, "Hammer," was stenciled over a pocket. Appellant ran from the state troopers, hopped a guardrail, went down an embankment and escaped. Upon a

search of the glove compartment of the vehicle, the state troopers found Uffelman's identification whereupon they contacted Philadelphia and learned for the first time that the body of Uffelman had been found on Delaware Avenue. A description of the appellant was issued and a neighbor of appellant who was a Pennsylvania State Trooper and who knew Freddie Hammer arrested Hammer the following night.

The defense presented expert forensic testimony to the effect that the documented fractures to the skull of the victim were consistent with a single blow and that the location of the blow was not inconsistent with a stance of the actors approximately facing one another. The expert witness further testified that the type of head wound suffered by the victim affected an area of the brain controlling involuntary responses and thus could induce an involuntary vomiting response *after* the blow to the head, contrary to the Commonwealth theory that Uffelman was vomiting at the time he was struck.

■ After a jury trial, appellant was convicted of murder of the third degree. Judgment of sentence imposing a term of imprisonment of seven and one-half to fifteen years was entered on March 19, 1980. Notice of direct appeal to this Court was timely filed on April 18, 1980.[1]

On appeal, Hammer argues that a pattern of examination of witnesses by the trial judge constituted advocacy of a point of view favoring the prosecution and that this undue participation adversely and prejudicially contributed to the verdict, thus amounting to a denial of due process, *Commonwealth v. Archambault,* 448 Pa. 90, 290 A.2d 72 (1972). The Commonwealth argues that the instances raised are waived due to the failure of trial counsel to object to the

1. It is disturbing for us to note that the trial judge delayed the filing of an opinion in this case for three years and ten months, notwithstanding inquiry being made by our prothonotary and with disregard for our rules. Such judicial lethargy must be strongly condemned, and we here do so.

court's questioning and are therefore not the proper subject of appellate review.

■ The difficult issue arises not in determining whether the judge's conduct was prejudicial, for that claim, discussed *infra*, is well-founded, but in determining whether the waiver doctrine precludes review due to counsel's failure to have lodged timely objection to each instance of objectionable questioning by the court as heretofore required by *Commonwealth v. Jones*, 487 Pa. 183, 185, 409 A.2d 25, 27 (1979); see also *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974); Pa.R.Crim.P. 1123(a).[2]

■ In the courtroom, the judge is the foremost authority, second to none and no governor of the judge's conduct resides in the courtroom save the judge. As stated in *Commonwealth v. Myma*, 278 Pa. 505, 123 A. 486 (1924):

> The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality.... To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice.

*Id.*, 278 Pa. at 508, 123 A. at 487. The duty therefore lies with the judge to insure that his conduct is "above reproach," *Schlesinger v. Musmanno*, 367 Pa. 476, 482, 81 A.2d 316, 319 (1951), or, minimally, is not prejudicial. We therefore question the continued validity of the waiver doctrine as applied to improprieties of the trial judge for

2. Only two instances of judicial questioning were objected to by counsel during the trial and were not so objectionable as to require a new trial. The remaining allegations were presented for the first time in post-trial motions, no objection having been raised by trial counsel at trial. Accordingly, the trial judge, in addressing these untimely raised allegations in post-trial motions, held the issue to be waived due to the failure of counsel to object. Upon direct appeal to this Court, appellate counsel also failed to properly present the issue so as to render it reviewable. To obtain review of an allegation of substantive trial error not raised by trial counsel, it is necessary that first counsel whose representation succeeds that of trial counsel advance the allegation in terms of alleged ineffective assistance of counsel for failure to preserve the issue for review by timely objection. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).

when the position of power and authority enjoyed by the judge is considered, the strict enforcement of the waiver doctrine becomes inadvisable.

■ The notion that the judge is the foremost regulator of his own conduct is amply recognized by the Code of Judicial Conduct, adopted by this Court in 1973, effective January 1, 1984:

> A judge should participate in establishing, maintaining, and enforcing, and *should himself observe, high standards of conduct* so that the integrity and independence of the judiciary may be preserved.

*Code of Judicial Conduct,* Canon 1 (emphasis supplied).

> A judge should respect and comply with the law and *should conduct himself* at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

*Id.,* Canon 2, Section A (emphasis supplied).

> A judge *should disqualify himself* in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) *he has a personal bias or prejudice concerning a party....*

*Id.,* Canon 3, Section C(1)(a) (emphasis supplied). Thus, an officer of the judiciary in this Commonwealth is charged with a self-regulating function and is deemed the foremost arbiter of his own personal bias or prejudice and hence his competence to preside over a matter.

■ Avoidance of a conflict of interest regarding financial matters requires that

> A judge *should inform himself* about his personal and fiduciary financial interests, and make a reasonable effort to *inform himself* about the personal financial interests of his spouse and minor children residing in his household.

*Id.,* Canon 3, Section C(2) (emphasis supplied). It would indeed be a contemptible system which required counsel in a civil case to ferret out the potential conflicts of interest

residing, for example, in a judge's financial interests in order to obtain the judge's disqualification. That duty resides expressly with the judge. So, too, would it be unacceptable to permit the inherent injustice of judicial impropriety to go without remedy in a *criminal* case for want of censure by objection of counsel. In a criminal prosecution, "[i]t is the *judge*, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial. '[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.'" *Lakeside v. Oregon*, 435 U.S. 333, 341–342, 98 S.Ct. 1091, 1096, 55 L.Ed.2d 319, 326–327 (1978) (citations omitted) (emphasis supplied).

The efficacy of counsel in assuring impartiality of the judge is negated by this self-regulatory function and the authority of the bench, for a judge who poses a question or makes a comment during trial is predisposed to believe that the question or comment is proper, lest it not be spoken. Given that predisposition, the likelihood that the judge will be well-cautioned by counsel's objection is negligible. In that context, the rationale underlying the waiver doctrine, that timely objection gives the court the opportunity to cure the error, becomes a relatively empty one. Indeed, the possibility exists that counsel's objection will be viewed as a source of annoyance [3] and may well aggravate the situation.[4]

**3.** That counsel's objections may serve only to annoy the court was evidenced in this case when counsel objected, during extended examination of the defendant by the court, to the court's inference that the defendant saw the victim put his gun back in his holster, when the defendant had not so testified. Upon counsel's objection, the court twice admonished counsel by saying "Don't jump on this court," and required counsel to apologize and assure the court that it "wouldn't happen again." N.T. p. 1287. Similarly, when counsel objected during the court's interruption of direct examination to a question of a defense expert witness, the court brusquely ruled, "All right. You object. I overrule it. Okay? I just overruled it." N.T. p. 1962.

**4.** The Court of Appeals of Kentucky, in also establishing an exception to the requirement of timely objection, observed:

Thus, we are not inclined to strictly enforce the waiver doctrine in the case of judicial intemperance for counsel cannot veto actions viewed by the judge to be wholly permissible. The role of the judge being inextricably intertwined with the dispensing of justice, it would be manifestly unjust to permit the embodiment of justice in the courtroom to thwart the criminal process without benefit of relief to the accused where the judge has crossed beyond the threshold of impartiality and where objection by counsel may be to no avail.

On this record, whereas it appears that objection would be meaningless to satisfy the reasons for raising objection and, as further reflected by this record, indeed intensified judicial animosity, justice is not served by the strict application of the waiver doctrine. Accordingly, we hold that the failure of trial counsel to object to questioning by the judge, who is charged with a function of self-regulation, will not under all circumstances render the allegation of judicial impropriety unavailable for appellate review.[5]

> When the trial judge makes an objectionable remark, counsel is faced with a dilemma. He may risk antagonizing the judge by calling attention to the objectionable remarks, which scarcely can be erased from the minds of the jurors by a subsequent admonition. If objection is made unsuccessfully, the harm may be aggravated and the situation may be worsened. He may make no objection in the hope that the jury will ignore the remark. This places the counsel in an unfair position and at a disadvantage which may not be due to any conduct on his part. . . . *Viewed in this light, an objection to the remarks of a trial judge is unnecessary,* . . .
> *Collins v. Sparks,* 310 S.W.2d 45, 48–49 (Ky.1958) (emphasis supplied).

5. Our holding today merely joins other areas of law in which the trial judge is routinely given sufficient discretion to meet the circumstances of the case, notwithstanding absence of objection or absence of input by counsel. A power corollary to the judge's duty to maintain the order and integrity of the judicial process, *Commonwealth v. Patterson,* 452 Pa. 457, 308 A.2d 90 (1973), is the contempt power, characterized as a right and power "inherent" in the court, *Commonwealth v. Marcone,* 487 Pa. 572, 410 A.2d 759 (1980), *Commonwealth v. Garrison,* 478 Pa. 356, 386 A.2d 971 (1978), *Commonwealth v. Haefner,* 470 Pa. 392, 368 A.2d 686 (1977), and neither objection by counsel nor institution of prosecutorial proceedings is prerequisite to the exercise of the contempt power.

However, this is not to say that in cases such as a request for judicial recusal, counsel is excused from making such a request.

 Turning to appellant's underlying claim, it is established that it is proper for the court to intervene to ask questions on facts which "did not appear from either counsel's examination" and which "had a tendency to enlighten the jury," *Commonwealth v. Myma, supra* 278 Pa. at 509, 123 A. at 487. However a new trial is required when the judge's remark is prejudicial; that is when it is of such nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial. *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973).

Indeed, while "[i]t is always the right and sometimes the duty of a trial judge to interrogate witnesses, . . . questioning from the bench should not show bias or feeling nor be unduly protracted," *Commonwealth v. Watts*, 358 Pa. 92, 96, 56 A.2d 81, 83 (1948), see also, *Commonwealth v. Miller*, 442 Pa. 95, 97, 275 A.2d 328, 329 (1971); *Commonwealth v. Brown*, 438 Pa. 52, 62–63, 265 A.2d 101, 107 (1970); *Commonwealth v. Patskin*, 372 Pa. 402, 418–19, 93 A.2d 704, 713 (1953), for, as observed in *Commonwealth v. Myma, supra:*

> *An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table.* To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. *It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurispru-*

It is also to the judge's satisfaction that the voluntariness of a guilty plea must be established. Pennsylvania Rule of Criminal Procedure 319(b) provides that "[i]f the judge is satisfied that the plea is understandingly and voluntarily tendered, he *may* accept the plea." The judge may refuse to accept a plea of guilty unless he determines that the plea is voluntarily and understandingly tendered. Assertions of counsel have no bearing upon the inquiry; it is a determination to be made solely to the satisfaction of the judge.

*dence.* Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses's credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them.

*Id.* 278 Pa. at 508, 123 A. at 487 (emphasis supplied).

■ Where the judge oversteps the bounds of propriety in examining witnesses, by exhibiting opinion, bias or prejudice, the jury must be deemed to be inordinately impressed by this evidence of the judge's opinion such that the defendant is deprived of a fair and impartial trial. The trial becomes not one of trial by jury, but of trial by jury as impressed by the judge.

■ Trial judge participation in the examination of the testifying defendant is acutely objectionable where there is any suggestion that the judge has an opinion regarding the credibility of the defendant or the plausibility of the events related by the defendant, *Commonwealth v. McCoy*, 401 Pa. 100, 162 A.2d 636 (1960); *Commonwealth v. Williams, supra.* "It is important that hostile comment of the judge should not render vain the privilege of the accused to testify in his own behalf." *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321, 1325 (1933). In *Commonwealth v. McCoy, supra*, a new trial was ordered due to the trial judge's questions which, with its "repetitive accusations and subtle sarcasms" in questioning the defendant, "would make satisfactory reading if the prosecuting attorney were putting the questions." *Id.* 401 Pa. at 108, 162 A.2d at 642 (Concurring and Dissenting Opinion, Musmanno, J.). Here, also, numerous questions of the defendant posed by the judge would have made "satisfactory reading" were they coming from the prosecuting attorney.

■ Where, as here, the credibility of the defendant was crucial and where his story was not totally lacking in verisimilitude, the need for judicial impartiality is para-

mount. An important area of the direct testimony by the appellant addressed the formally recorded statement made by the appellant to police. The appellant testified that he was first ordered to strip for examination before the eight officers assembled and then redress before being questioned for hours prior to the actual compilation of a statement. He testified that he was clearly aware of what the police wanted to hear and that he complied in order to end the questioning and that from those involuntary statements, a written statement was improvised by the police. In advancing this assertion, the defense stressed the stilted phrasing of the answers on the written statement as evidence that they were not simultaneously recorded as the statement purported but were improvised by the police.

The court repeatedly interrupted defense counsel's direct examination of the defendant on this issue to pose questions suggesting that the *content* of the written answers conformed: "But the content of that answer, does that contain exactly what in fact you were wearing?" When the defendant responded that he "never said it like that," the court retorted, "No, but I'm saying that the content of the answer, is there anything wrong about the clothing described as far as being the clothing actually you were wearing?" to which the defendant responded, "No." N.T. pp. 1146–1147. Again, on another detail, the court challenged the defendant, "How does that differ from what you told them?" N.T. 1149.

Another prosecutorial line of questioning pursued by the court pointedly suggested that there was a serious inconsistency in the defendant's testimony relating to the legal duty to retreat. Appellant testified on direct that the reason he did not simply run away from the decedent once outside of the car was because he was afraid decedent, who harbored a pistol, would shoot him as he ran. However, it will be recalled that appellant did run away from the two state troopers who stopped him approximately an hour following the incident:

BY THE COURT:

Q. You stated that you didn't run from the rear of the Uffelman vehicle because you were fearful of Uffelman's gun, right?

A. Yes, sir.

Q. Okay, now when you were stopped on Route 1 by the two State Troopers, did you see that they were armed?

A. I assume they were. I don't remember if I seen a gun.

Q. *Well, why weren't you just as fearful in running from them, of their firearms, as Uffelman's firearm?*

A. I guess—I don't know. I can't tell you how I felt, really.

N.T. 1783 (emphasis supplied). This purported inconsistency, which even the prosecution in cross-examination had not deemed worthy of emphasis, cannot be said to have any permissible judicial purpose to clarify testimony or to "enlighten the jury" and was clearly advanced by the court in an adoption of a prosecutorial function.

Numerous additional questions posed by the court prejudicially exhibited incredulity regarding the plausibility of the defendant's version of events and, again, would be appropriate as cross-examination by the prosecution, not as questioning by the judge. When the defendant testified on direct that he believed he didn't have enough money to take a bus and decided to walk. The court asked: "Did the thought ever occur to you to ask anybody what the fare for public transportation was as you were walking on the street as you were passing people?" N.T. p. 1203.

When the defendant testified that he continued to walk because he believed he was not too far from the airport, the court pursued a line of questioning based on the fact that appellant spent a brief period stationed at the Philadelphia naval base: "How far is the distance between the Naval Base and the airport?" "You have traveled that, haven't you." "How long does it take you by car to get from the Naval Base to the airport?" "It takes more than five minutes to get from the Naval Base to the airport, doesn't it?" N.T. p. 1248.

The court chose to reinforce a Commonwealth point, already covered by the prosecution, that if, as appellant testified, the decedent's intentions were sexual, he would have turned off the main road on which they traveled: "Did he ever go off that big street when you were riding with him?" "Did he ever cut off into any of the side streets or any of the other streets?" "He always stayed on Delaware Avenue, right?" N.T. p. 1274–5.

When the defendant's recitation of how he placed long-distance phone calls from a public phone booth, by dialing directly the number preceded by a zero, apparently failed to comport with the court's experience, the court asked: "How can you tell us that you got the number direct?" N.T. p. 1056.

The court also pursued questioning of the defendant to elicit evidence related to state of mind, a crucial issue in the case with regard to the degree of guilt, but a subject of judicial commentary viewed with disapproval in *Commonwealth v. McCoy, supra,* 401 Pa. at 116, 162 A.2d at 647. The victim was found dead on the same day as the incident but when appellant was questioned the following day, he was told that the victim survived. The court inquired, "Concerning the way the man was struck in the head with the post, did you have any doubt in your mind concerning the [interrogating officers false representation to you] that [the decedent] was all right, did you have any doubt in your mind—" Even though this question was answered by appellant without evasion, the court pressed: "Did you have any doubts in your mind that he could not have been all right in light of the way that he had been hit with the item?" "You had no doubts that that could be incorrect from what you had experienced by striking the man?" N.T. p. 1605–6. Later, the court inquired, "At the time that you were swinging that post, did you intend to strike the man with the post?" N.T. p. 1754.

During the assistant district attorney's cross-examination of the defendant and while he was questioning the defendant on what events the defendant had conveyed to his

girlfriend the evening of the incident, the court interrupted the examination asking, "Did you tell her that you escaped from the State Police?" "A. Excuse me?" "Q. Did you mention the escape from the State Police to Miss Hargan?" "A. I told her that I was stopped on Route 1 by State Police and I ran from them." N.T. page 1502.

Another round of prosecutorial questioning by the court occurred during the court's questioning of a defense surrebuttal expert witness, a brief background of the origin of which is necessary. The defendant testified that the decedent made a homosexual advance which, when rebuffed by the defendant, prompted the violence which eventually resulted in the decedent's death. The Commonwealth rebutted this evidence of homosexuality by presenting both the decedent's wife who testified to a "normal" sexual life with decedent and an absence of any indication of bisexuality as well as numerous reputation witnesses who testified to the decedent's reputation for heterosexuality.

In surrebuttal of this reputation evidence, the defense proffered two witnesses, a psychiatrist specializing in "sexual disorders" and a sociologist, both involved in the voluntary treatment of bisexual and homosexual men. The import of the psychiatrist's testimony was that his experience in the treatment of bisexual men who were heterosexually married was that the homosexual aspect of their lives was hidden and secretive and that it was common in those cases for the man to pursue the homosexual aspect of life in a clandestine, anonymous manner unknown to family and friends, and that such activity may be coupled with alcohol consumption, the "disinhibiting" effect of which, eases the expression of an otherwise restrained conduct. From this the defense argued that the Commonwealth reputation evidence of heterosexuality did not conclusively negate the defendant's testimony that the victim propositioned him.

The witness' opinion was based on direct clinical experience over 20 years with approximately 900 bisexual married male clients. The court aided the prosecution's able cross-examination to pursue a line of questioning regarding sam-

pling techniques in which he pressed the witness whether "in all intellectual honesty" the evidence proffered by the witness based "on so few cases, an average of 45 a year" had any statistical relevance to the general male population in Philadelphia. N.T. p. 1984.

The second witness, a sociologist engaged in the preparation of his thesis relating to bisexuality in heterosexually married men, also testified that in his experience with the treatment of bisexual men, reputation was not conclusive in that the pursuit of the homosexual aspect tended most often to be clandestine. The court presented a misleading and distorted syllogism allegedly relevant to the inquiry and challenged the "logic" of the witness' testimony in a manner suggesting that the testimony dangerously led to "inferring untruth:"

BY THE COURT:

Q. [W]hat is the soundness and logic to this statement: Any adult heterosexual married man concerning whom there is no repute of being a homosexual in the community must accordingly be engaging in homosexual activities because they are clandestine?

A. Well, I would not agree with that statement.

Q. Well, that's the converse of what you just gave an opinion on, isn't it?

A. Well, it was my impression that the statement was, "could such a person engage in such activity," that's how I understood the question.

Q. Well, what's the difference in the logic? Any adult heterosexual who is married, concerning whom there is no reputation with respect to homosexual activities, could be a homosexual?

A. Yes, that's correct.

Q. That's correct?

A. Yes.

Q. And that's logical; that's a logical conclusion?

A. That the possibility is there that someone—yes, I would have to say that.

> Q. *Isn't there a danger of inferring untruth due to the absence of proof in that hypothesis that you said is sound?*

N.T. pp. 2022–2024 (emphasis supplied). This entire line of questioning would make suitable reading if elicited by the prosecution, but when elicited by the judge, it is clearly improper. In the case of prosecutorial cross-examination, jurors are likely sufficiently sophisticated to discern the subtlety between the two propositions. However, to the extent the "learned" court determinedly suggests, by the application of "logic," that the witness' testimony does lead to the court's distorted extension of the proposition, jurors easily impressed by the court may come to view the witness' entire testimony as a threat. That the witness' answers rebutted the judge's suggestions does not adequately mitigate the impact of the questioning for the witness' response in the negative "would have little weight in the face of the obviously determined opposition of the judge." *Commonwealth v. McCoy, supra,* 401 Pa. at 107–108, 162 A.2d at 642.

Almost immediately thereafter when the same witness testified to the reputation his clients believed they enjoyed, the court interrupted direct examination to cross-examine the witness to advocate the assertion that because the witness had not conducted interviews in the community regarding the clients' reputations for heterosexuality, the witness had "no true basis" for testifying to the clients' reputations other than what the clients reported them to be. N.T. p. 2025.

Perhaps the most telling episode of the court's orientation to the prosecution occurred during the assistant district attorney's cross-examination of this witness when defense counsel lodged an objection and the court not only failed to rule on the objection but also forcefully supplemented the prosecution's question. The subject was an apparent inconsistency between the sociologist's testimony and the prior testimony of the psychiatrist. The assistant district attorney had asked whether in the sociologist's experience he

perceived a pattern of behavior in which his interviewees sought "anonymity and secrecy" in choosing the physical locations for such homosexual encounters, e.g., avoidance of public bars frequented by homosexual men. When the witness responded, "I would say that those are not necessary characteristics of the place they would choose," the assistant district attorney questioned whether "it would surprise you to learn that about an hour ago, someone who has said he has interviewed 7,000 of people ... in describing where the 7,000 people he has interviewed chose their locations [used] the catchwords of anonymity and secrecy; is your opinion different?", whereupon defense counsel objected to the prosecution's extreme mischaracterization of the extensiveness of the preceding witness' testimony. The court added: "All right. And the person who expressed the opinion holds a medical degree and a degree in psychiatry, I might add, to that statement," N.T. pp. 2030–2031, and did not rule on the objection.

 A presentation of the numerous other improprieties by the judge is unnecessary for the prejudicial tenor of the trial is apparent from those already enumerated. While each instance, viewed alone, perhaps may not warrant the conclusion of a denial of due process, in the aggregate, such a determination is compelling. Accordingly, we reverse the judgement of sentence entered by the trial court and remand for a new trial.[6]

McDERMOTT, J., filed a dissenting opinion in which PAPADAKOS, J., joins.

6. The additional claim raised by appellant relates to the *Miranda* warnings given upon his initial arrest. Appellant alleges that the warnings given were constitutionally invalid because the police officer did not specify that the appointment of an attorney would be "without cost." The warning given appellant regarding appointment of counsel included the admonition that "if he *couldn't afford* an attorney, one would be appointed for him." N.T. Suppression Hearing, p. 116 (emphasis supplied). Appellant's argument was considered and rejected by this Court in *Commonwealth v. Ponton,* 450 Pa. 40, 299 A.2d 634 (1972).

McDERMOTT, Justice, dissenting.

On the evening of October 13, 1978, the body of a man was found lying on Delaware Avenue in Philadelphia. The man's rear pocket was ripped and his head battered. A piece of lumber lying nearby fit the possibilities of a robbery and murder. The man was identified as an off-duty police officer and his car was missing. Alarm and hunt swiftly followed. The appellant was in possession of the victim's car and fleeing for fear or guilt was racing to his home in Oxford, Pennsylvania. Stopped for speeding by state troopers on his way, he jumped from the car, fled over ditch and field to a nearby home, sought the use of a phone, and summoned his girlfriend to drive him home. The officers recalled the name "Hammer" stenciled on his shirt. The next day the state police net ineluctably closed around him. He was apprehended and a search warrant found the victim's wallet hidden under his bedroom rug. Faced with the coming inculpation of the car and the victim's wallet, the appellant told police that all was in fact innocent. Unfamiliar with Philadelphia, he said he was in that city for a day's work as a carpenter, he fell from a scaffold, and while briefly hospitalized, lost contact with his brother. He called home and asked his stepfather to come for him. Believing the airport to be a central location he set that as the place for meeting. Short of money, he started walking to the airport. It was further away and a longer walk than he thought. On Delaware Avenue he met the victim who offered him a ride. During the ride he said the victim made menacing homosexual advances, stopped the car, and at gun point forced appellant out to accomplish his purpose. On the pavement as the victim approached, he saw a piece of wood, scuffled and successfully struck the deceased with the length of wood. The deceased fell to the ground and appellant in fear escaped.

Upon its face, his version has a note of bucolic innocence; a luckless country lad, villainized in the big city, is forced to violence and flees in fear from both the villain and the police. We did not see or hear him; the jury did and to

them he played all the notes of that scenario. All contradictions, and there were many in his version, were assigned to fear and excitement. The Commonwealth pursued him upon the theory that he came upon a man who was ill and vomitting, struck him down, robbed him, and fled with his car. In a long and thorough trial, the appellant took the stand to explain and the dooming evidence was put to test. The jury found him guilty of third degree murder; that is he intended to do serious bodily harm but did not intend to kill. They might have done more. The majority have done more. They have found that what was essentially a cliche ridden explanation, was further damaged when the trial judge asked certain perfectly proper, relevant questions.

As support for their point, they have chosen excerpts from the record that, standing out of the context of two thousand pages of testimony, are offered to depict the trial judge as an inquisitor, engaging the appellant in questions, the answers to which, at least to their minds, must prove a fatal trap.

The majority opinion enumerates several examples of this so-called "prosecutorial" questioning on the part of the trial court. The first example comes from the direct examination of the appellant by his attorney and concerns a written statement which the appellant asserts was improvised to some extent by the police.

BY MR. DUFFY (Defense Counsel):

Q. All right. Take a look at page 6, Freddie. Are the words on that page that are next to the "A." 's, that is, indicating answers, are those words all your words?

A. No, sir, they are not.

Q. Take the first question: "Freddie, Can you tell me what you were wearing last night when the man picked you up?

"I was wearing a short-sleeved denim Navy work shirt with my last name, Hammer, stenciled across the left-hand top pocket, a pair of long johns, and Navy blue denim work pants and work shoes."

Is that precisely the way you answered the question?

A. No, sir, it is not. He told me that my name was stenciled across the left-hand top pocket because the police officers that were downstairs identified me and they said that was what I had across my left-hand top pocket.

BY THE COURT:

Q. But the content of that answer, does that contain exactly what in fact you were wearing?

A. That's what I told him I was wearing but I never said it like that.

Q. No, but what I'm saying that the content of the answer, is there anything wrong about the clothing described as far as being the clothing actually you were wearing?

A. No, sir, this is the clothing I was wearing.

 MR. DUFFY: Is Your Honor finished?

 THE COURT: Yes.

BY MR. DUFFY:

Q. Do you know whether you had a shirt on on the night of October 13th that had "Hammer" written across the left breast?

A. I'm not sure. I had a lot of Navy shirts and some of them say "Hammer" on it and some of them don't.

Q. Amongst the ones that say "Hammer", are they all identical?

A. No, there are some that say "Hammer, F.P.", with the initials "F.P." after it, and some just say "Hammer" on it.

Q. And some that say nothing?

A. Yes, sir.

Q. All right. Do you know what you told the police when they asked you what you were wearing?

A. I told them I was wearing a Navy shirt with Navy pants and a pair of work shoes and some long underwear.

Q. How did the "Hammer" across the pocket come into this answer? That's what I want you to tell the jury.

A. That's when they told me that the policemen downstairs identified me as being Hammer because they said

that my name "Hammer" was stenciled across my left pocket.

Q. All right. Were you asked about your injuries? You said that Detective Graham wanted Pascali to get the injuries down.

Were you asked about the injuries?

A. I was asked earlier. I don't know if I was asked then.

Q. All right. Did you tell the police—is this your sentence, are these your words: "While running from the police, I fell in the creek face first and my left knee hit a rock. The knee is swollen with numerous scratches and bruises."

Are those your words?

A. No, sir, I would never say something like that.

Q. Do you remember what you told the police about your injuries, particularly about that area?

A. They asked me earlier why—what was wrong with my knee and I told them that I hit a rock when I fell in the creek. I don't know where they got numerous scratches and bruises. They are not my words.

BY THE COURT:

Q. Doesn't this say—the answer: "I fell in the creek and my left knee hit a rock."

How does that differ from what you told them?

A. I didn't tell them I fell in the creek face first.

THE COURT: All right.

BY MR. DUFFY:

Q. Did you tell them the knee was swollen with numerous scratches and bruises?

A. No, sir, I never said that.

(N.T. 1146–1149). The majority catagorizes these questions from the bench as repeated interruptions of the direct examination. I, on the other hand, looking at the questions in the context of the whole, believe the judge was doing no more than exercising his right and his duty to clarify issues by interrogating the witness. *Commonwealth v. Manning,*

495 Pa. 652, 435 A.2d 1207 (1981). I can only assume that trial counsel felt the same because, as the exerpt shows, he did not protest. A similar review of the other so-called examples of "improprieties by the judge" leads to the inescapable conclusion that counsel had good reason for not objecting; there was nothing to which to object.

To find in the trial judge's question some other motive, against the inherent and necessary logic of the question, is the reflection in the jaundiced eye. The majority seems more anxious to find fault with the trial judge than to consider the intrinsic question whether appellant received a fair trial. It is true that during surrebuttal the trial judge seemed somewhat disturbed with the proof offered that there are latent propensities in persons that are not known either to themselves or others until they surface. He did not, however, denigrate that common fact. What he did do was question the "scientific proof". Perhaps it would have been better had he let the witness proceed unquestioned. Notwithstanding his questions however, the witnesses did in fact give their "scientific proofs" that there are closet homosexuals; proof equivalent to the fact it sometimes rains in Indianapolis.

The decision of the majority is disturbing for yet another reason, in that they have this day decidedly weakened the perfectly sound legal principle that objections to perceived trial errors will be waived unless they are made at the time the alleged error occurs. *Commonwealth v. Jones*, 487 Pa. 183, 409 A.2d 25 (1979); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974). When the perceived error is a claim of judicial partiality, a strict application of that waiver doctrine is inadvisable, says the majority, because a judge is not likely to become impartial simply because he is asked to do so by counsel. And besides, so their rationale goes, the judge might become annoyed.

To make an exception to the waiver doctrine so that counsel may avoid the possibility of antagonizing the trial judge serves no legitimate purpose. An attorney's first duty in this situation is to his client. A timely objection to a

114

real or imagined pattern of judicial impropriety or bias, made on the record, in or out of the jury's presence, is not too much to ask.

PAPADAKOS, J., joins in this dissenting opinion.