J-A31001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JONATHAN AYALA, | |
| Appellant | No. 1313 EDA 2015 |

Appeal from the Judgment of Sentence Entered April 2, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005085-2012

BEFORE: BENDER, P.J.E., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED DECEMBER 20, 2016**

Appellant, Jonathan Ayala, appeals from the judgment of sentence of an aggregate term of 30 to 60 years' incarceration, followed by 15 years' probation, imposed after he was convicted of attempted murder and related offenses. Appellant challenges the trial court's failure to strike certain testimony by a Commonwealth witness, as well as the court's ruling that a portion of Appellant's trial would be closed to the public after a member of the trial audience made an improper comment to a juror. After careful review, we affirm.

The trial court summarized the facts of this case as follows:

> On September 3, 2011, Philadelphia Police Officer Howard Lee was sitting inside his patrol car outside 4210 Whitaker

---

[*] Former Justice specially assigned to the Superior Court.

Avenue when he heard gunfire coming from the rear of a night club [*sic*] called the Casa De España that was situated at that location. The officer exited his vehicle and ran to the rear of the club. While doing so, he heard more gun shots [*sic*] and encountered numerous people running from the rear parking lot while screaming that the gun fire [*sic*] was coming from the rear of the club.

Once in the rear of the club, Officer Lee spoke to a male named Jose Pagan and saw numerous other persons running away from the club. Based on information received from Mr. Pagan, Officer Lee proceeded to a driveway leading onto Hunting Park Avenue and observed a dark colored vehicle exiting the driveway onto westbound Hunting Park Avenue at a high rate of speed. Officer Lee notified police radio of the description of the car and its direction of travel.

After the vehicle sped away, Officer Lee returned to the rear of the club to secure the crime scene. Upon his return, he observed Edwin Santana, with blood visible on his clothing covering his abdomen, outside the club. Officer Lee later gave a statement to police detectives detailing his activities that evening.

Police Officer Anthony Sampson was driving his patrol car eastbound on Whitaker Avenue at or about the time of the incident when he received a radio call informing him that shots had been fired at Whitaker and Hunting Park Avenues. He immediately proceeded to that location and[,] as he was arriving, he heard people screaming that there had been a shooting and three persons had been shot. Officer Sampson also observed a car traveling west on Hunting Park Avenue at a high rate of speed. The Officer made a u-turn after hearing several by-standers yell, "That's the car. That's the black car - an Acura." Police Officer Sampson pursued the vehicle along with several other officers all of whom were attempting to stop the car. At one point, the driver of the car being pursued stopped briefly at Front and Luzerne Streets but then sped away when Officer Sampson stepped out of his vehicle. Police finally stopped the vehicle when it crashed into a pole during the pursuit in the 4000 block of Front Street after a ten block high speed chase.

The [v]ictim, Mr. Santana, suffered multiple gunshot wounds during the incident. He was taken to a nearby hospital

for treatment. While there he gave a signed statement to Philadelphia Police Detective James Perfidio wherein he related that he had an altercation inside the Casa De España nightclub. The fight spilled outside where he was approached by two individuals, one of whom shot him. In his statement, Santana gave a description of the two males, the guns they used, and said that they fled in a black vehicle he believed was a Honda down Whitaker Avenue to Hunting Park Avenue.[2]

> [2] Santana completely disavowed having given the statement stating that he was high when he was shot and when he was interviewed by police. Detective Perfido testified that Santana was awake and alert, did not appear to be under the influence, and that he signed his statement. He added that he recorded Santana's responses verbatim. Santana described his assailants as follows: One was a short Hispanic male with long braids wearing a blue shirt. The second guy was 5' 11", Hispanic male, with short braids and a turquoise shirt.[]

Mr. Pagan was present when the shooting occurred. He related that he was inside the club with an acquaintance named Chio,[1] who got into a fight with a male after the male and Chio's girlfriend became involved in a dispute. After the fight, Pagan told Chio to leave because the person Chio fought with had been escorted from the [c]lub and he did not know who he was. Pagan and Chio then left the club to smoke a cigarette. When they got outside, two men approached from behind the building armed with handguns.

When []Chio[] saw the two men, he told one of them to put his gun down and fight him "like a man." The men did not put down the guns but instead began firing at Chio. When they stopped shooting, the two males walked behind the building after which Pagan saw a dark sporty Honda speed out of the lot.

Shortly after the shooting, police transported Pagan to the location where the fleeing vehicle had crashed. Once there, Pagan identified the vehicle as the one he saw drive from the lot and told police that the two males police had in custody were the males he saw shoot Chio. Pagan also gave police a statement

---

[1] It is undisputed that Chio is a nickname for Edwin Santana.

describing the person who shot Chio as having on a teal shirt with his hair in braids. Pagan, however, could not identify where each [individual] was seated in the vehicle because they were already outside when he was brought to the location to identify them.

Police Sergeant David Pinkerton participated in the pursuit of the [vehicle], and prevented it from leaving after it became disabled. Sgt. Pinkerton approached the vehicle and observed its driver, later identified as Rodriguez-Diaz, who had braids and was wearing a teal greenish colored shirt, climbing from the driver's seat into the rear seat. [Sgt.] Pinkerton immediately placed Rodriguez-Diaz in custody as other officers apprehended the front seat passenger, Appellant Jonathon [*sic*] Ayala, who also was wearing a teal greenish colored shirt. The sergeant then secured the vehicle for later examination. As he did so he observed a black automatic handgun behind the driver's seat. The gun was secured and found empty of ammunition.

[Sgt.] Pinkerton was present when Mr. Pagan arrived at the scene to identify [Appellant and Rodriguez-Diaz]. Although the [s]ergeant could not hear what Pagan said[,] he observed him shaking his head "yes" while pointing to Rodriguez-Diaz and [Appellant], and the vehicle. After Pagan identified [Appellant and Rodriguez-Diaz], [Sgt.] Pinkerton retraced the route of the pursuit. While doing so, he recovered a Glock hand gun [*sic*] in the general area where the … vehicle struck a utility pole as it fled police. He conceded that during the pursuit, he did not see the gun thrown from the vehicle.

Police obtained a search warrant for [the] vehicle. Upon executing the warrant, they seized the handgun, a .45 caliber Colt MK4, from the backseat. They also collected the Glock received by [Sgt.] Pinkerton on the highway as well as ten .45 caliber fired cartridge cases and a projectile in the rear parking lot of the club. Police observed bullet holes in the door of the club and recovered a bullet fragment inside the club.

The ballistic evidence was later examined by Police Firearms Examiner Ann Marie Barnes. Her examination revealed that the ten fired cartridge cases and the spent projectile had been fired from the Colt .45 hand gun [*sic*] recovered from the rear of the … vehicle.

- 4 -

Trial Court Opinion (TCO), 1/21/16, at 2-6 (citations to the record and one footnote omitted).

In January of 2015, Appellant and Rodriguez-Diaz were tried together before a jury, and both men were convicted of various offenses. Specifically, Appellant was convicted of attempted murder, 18 Pa.C.S. § 2502; conspiracy to commit murder, 18 Pa.C.S. §§ 903 and 2502; aggravated assault, 18 Pa.C.S. § 2702; possessing an instrument of crime, 18 Pa.C.S. § 907; possession of a firearm by a person prohibited, 18 Pa.C.S. § 6105; carrying a firearm without a license, 18 Pa.C.S. § 6106; carrying a firearm on a public street in Philadelphia, 18 Pa.C.S. § 6108; and recklessly endangering another person, 18 Pa.C.S. § 2705.[2] On April 2, 2015, Appellant was sentenced to an aggregate term of 30 to 60 years' imprisonment, followed by 15 years' probation. He filed a timely notice of appeal, and also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The court filed a Rule 1925(a) opinion on January 21, 2016.

Herein, Appellant presents three issues for our review:

I. Should the testimony of [Sgt.] Pinkerton that after a car chase, each defendant was identified as being involved in the

_____

[2] Rodriguez-Diaz was convicted of conspiracy to commit murder, possessing an instrument of crime, possession of a firearm by a person prohibited, carrying a firearm without a license, carrying a firearm on a public street, and recklessly endangering another person. He was sentenced to an aggregate term of 16 to 36 years' incarceration, followed by 5 years' probation.

shooting by Jose Pagan have been stricken because it violated the Confrontation Clause and was double hearsay?

II[.] Was the failure to strike Sgt. Pinkerton's identification testimony harmless?

III. Did the court err when it closed the courtroom after learning that one juror was approached in the hallway outside the courtroom by a person who said, "He's not guilty"?

Appellant's Brief at 11 (unnecessary capitalization omitted).

Appellant's first two issues are related and may be addressed together. Appellant takes issue with the court's decision to deny his motion to strike certain testimony by Sgt. Pinkerton. As context for Appellant's claim, Sgt. Pinkerton offered the following testimony on direct-examination, regarding Jose Pagan's identification of Appellant and Rodriguez-Diaz at the scene of their vehicle crash:

[The Commonwealth:] When [Pagan] gets to that location, what is he brought there for?

[Sgt. Pinkerton:] For identification.

…

[The Commonwealth:] … [Pagan] is brought there and first he is there to look at the vehicle? Is that fair?

[Sgt. Pinkerton:] Yes.

[The Commonwealth:] Does he identify that vehicle.

[Sgt. Pinkerton:] Yes.

[The Commonwealth:] The two individuals that you said were already in handcuffs.

…

Does he identify any of those individuals?

[Sgt. Pinkerton:] Yes. Both males, one at a time, are taken out of the vehicle. The witness has a chance to identify. **Identified both individuals as the males from the shooting up on Whitaker Avenue.**

N.T. Trial, 1/22/15, at 192-93 (emphasis added).[3]

On cross-examination, defense counsel questioned Sgt. Pinkerton further about Pagan's identification of Appellant and Rodriguez-Diaz:

[Defense Counsel:] And with regard to Mr. Pagan, you were at the scene and he did not identify [Appellant] as doing anything at the [nightclub]; correct?

[Sgt. Pinkerton:] The only thing I got that was at the scene [was] he said -- he pointed to both of them, shook his head yes. I didn't have a conversation [with Pagan]. The officer that had both -- had [Pagan] in the car had the conversation with him.

…

_____

[3] Appellant also takes issue with the following testimony by Sgt. Pinkerton:

[The Commonwealth:] Why is it that [Appellant and Rodriguez-Diaz are] taken out one at a time?

[Sgt. Pinkerton:] … They're separated right away. Two different cars. So it gives the eyewitness a chance to take a look at one. **And he says yes, [or] no. We put them back in the vehicle, and then we direct the other defendant to come out. Then he's ID'd.**

N.T. Trial, 1/22/15, at 193 (emphasis added). While Appellant suggests that this testimony by Sgt. Pinkerton was another reference to **Pagan's identification** of Appellant and Rodriguez-Diaz, we disagree. Instead, it seems that the sergeant was referring to the general way in which witnesses are asked to separately identify multiple suspects. Thus, we do not consider this testimony by Sgt. Pinkerton to be the type of 'identification evidence' at issue herein.

[Defense Counsel:] So wait a minute. At no time does the witness identify to you what person A, the passenger, and person B did?

[Sgt. Pinkerton:] No.

*Id.* at 208-09. Upon further questioning by defense counsel, Sgt. Pinkerton acknowledged that he did not hear or see Pagan identify Appellant and/or Rodriguez-Diaz; rather, Pagan's identification had been "relayed" to him by another officer. *Id.* at 209-211.

After Sgt. Pinkerton's testimony concluded, both Appellant's and Rodriguez-Diaz's attorneys moved to strike Sgt. Pinkerton's testimony regarding Pagan's identification of Appellant and Rodriguez-Diaz. *Id.* at 223. A lengthy and confusing discussion regarding that motion ensued, during which both defense attorneys seemingly argued that Sgt. Pinkerton's *direct-examination* testimony regarding Pagan's identification should be stricken. In other words, the defense sought to strike the sergeant's statement that Pagan "[i]dentified both individuals as the males from the shooting up on Whitaker Avenue." *Id.* at 193. The defense argued that this testimony constituted "secondhand hearsay," *id.* at 227, as Sgt. Pinkerton had admitted on cross-examination that he did not actually hear or see Pagan make that identification, but had only been told about it by another officer. The trial court ultimately denied defense counsels' motion to strike.[4]

_____

[4] It seems that the trial court misunderstood defense counsels' motion to strike as pertaining to the *cross-examination* testimony of Sgt. Pinkerton, and declined to strike that evidence because it had been elicited by the
*(Footnote Continued Next Page)*

Now, on appeal, Appellant contends that the trial court erred by not striking Sgt. Pinkerton's direct-examination testimony. We need not delve into the specifics of his argument, nor determine if he is correct, as we agree with the Commonwealth that this purported error was harmless.

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. ***Commonwealth v. Robinson****, 554 Pa. 293, 721 A.2d 344, 350 (1999).*

***Commonwealth v. Stallworth***, 781 A.2d 110, 120 (Pa. 2001).

Here, the Commonwealth maintains that any prejudicial effect of Sgt. Pinkerton's direct-examination testimony was insignificant, and could not have impacted the verdict when compared to the "overwhelming circumstantial evidence" that proved Appellant and Rodriguez-Diaz committed the shooting. Commonwealth's Brief at 9. We agree. Namely, Pagan himself took the stand and testified that the two people he saw at the

---

*(Footnote Continued)* ———————————

defense. ***See id.*** at 227; ***see also*** TCO at 9. However, our review of the record demonstrates that the defense was asking the court to strike the *direct-examination* testimony by Sgt. Pinkerton regarding Pagan's identification. ***See*** N.T. Trial, 1/22/15, at 226. Notwithstanding the court's misapprehension in this regard, it is well-established that we may affirm the trial court "on any valid basis, as long as the court came to the correct result…." ***Wilson v. Transport Ins. Co.***, 889 A.2d 563, 577 n.4 (Pa. Super. 2005) (citations omitted).

scene of the vehicle accident were the same "two people that [he] saw outside with guns and shooting at [the victim]…." N.T. Trial, 1/22/15, at 180. In addition to Pagan's identification, the Commonwealth presented evidence demonstrating that Appellant and Rodriguez-Diaz fled from police and, when their vehicle ultimately crashed, the firearm used in the shooting was found inside the car, and a second gun was found in the street along their route of flight. In light of this evidence, we are convinced that the jury's verdict did not hinge on Sgt. Pinkerton's direct-examination statement indicating that he heard Pagan identify Appellant and Rodriguez-Diaz at the scene of the vehicle crash. Therefore, Appellant's first and second issues fail, as any error by the court in not striking Sgt. Pinkerton's testimony was harmless.

In Appellant's third issue, he contends that the trial court erred by closing the courtroom to public spectators after a juror informed the court that a member of the trial audience had said, "[h]e didn't do it," to that juror. N.T. Trial, 1/23/15, at 92. When the juror informed the court about this comment by a public spectator, the court closed the courtroom and colloquied all members of the jury. *Id.* at 92-105. After the colloquies were completed, the trial court stated that for "[t]he remainder of this trial, I'm going to close off the courtroom. Okay?" *Id.* at 105. Appellant did not object to the court's decision. *See id.*

Because Appellant failed to lodge an objection, the trial court concludes, in its Rule 1925(a) opinion, that Appellant has waived his claim

- 10 -

that the court erred by closing the courtroom to public spectators. *See* TCO at 13. In response, Appellant contends that "it was clear that the court had decided to [close the courtroom], and under such circumstances an objection should not be required." Appellant's Brief at 25 (citing *Commonwealth v. Hammer*, 494 A.2d 1054, 1060 (Pa. 1985), *abrogated on other grounds by Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002)).

Appellant's reliance on *Hammer* is unconvincing. There, Hammer argued that the trial judge improperly engaged in a "pattern of examination of witnesses" that "constituted advocacy of a point of view favoring the prosecution and that this undue participation adversely and prejudicially contributed to the verdict, thus amounting to a denial of due process." *Hammer*, 494 A.2d at 1058. While Hammer had not objected to the court's conduct, our Supreme Court ruled that his failure to do so did not waive the claim for appellate review. The Court reasoned that any objection by Hammer would have been "meaningless to satisfy the reasons for raising objection" and could have even "intensified judicial animosity" against him. *Id.* at 1060. Accordingly, the *Hammer* Court held "that the failure of trial counsel to object to questioning by the judge, who is charged with a function of self-regulation, will not under all circumstances render the allegation of judicial impropriety unavailable for appellate review." *Id.* (footnote omitted).

Here, the trial court was not questioning witnesses; rather, the court decided to preclude the public from viewing Appellant's trial after a member

of the audience made an improper comment to a juror. Nothing in the record suggests (nor does Appellant aver) that the trial court's decision stemmed from animosity toward Appellant, or that the court would have responded with annoyance had Appellant objected. Indeed, after the court stated that it was closing the courtroom, it invited a response by Appellant by asking, "Okay?" Appellant made no comment or objection, and his trial continued without a public audience. Under these circumstances, we do not agree with Appellant that the limited waiver exception announced in **Hammer** applies to his failure to object to the court's purported error of closing the courtroom. Consequently, Appellant has waived his challenge to that decision on appeal.[5]

Judgment of sentence affirmed.

---

[5] In any event, we note that Appellant's argument pertaining to the merits of this issue is insufficient to demonstrate an abuse of discretion by the trial court. **See Commonwealth v. Phillips**, 946 A.2d 103, 108 (Pa. Super. 2008) ("A trial court's decision regarding access to judicial … proceedings is within the sound discretion of the trial court, and we will reverse only if the trial court abuses its discretion."). Appellant avers that "[t]he closing of a courtroom is a very serious matter and closure is and should be the rare exception, and may not be ordered absent careful balancing of competing interests, consideration of alternatives to closure, and [an] articulation of findings." Appellant's Brief at 25 (citing **Presley v. Georgia**, 558 U.S. 209 (2010)). However, aside from stating these legal precepts, Appellant offers no discussion of how they apply to the case at hand. For instance, Appellant does not suggest what alternative measures the court could have taken, other than closing the courtroom. He also does not discuss how his interest in a public trial outweighed the risk that audience members would comment to jurors or make other attempts to influence the verdict. Accordingly, even had Appellant not waived this claim, he has not demonstrated that the trial court abused its discretion in closing the courtroom to the public.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/20/2016</u>