J-A01009-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LANCE E. MASSE, | |
| Appellant | No. 2877 EDA 2014 |

Appeal from the Judgment of Sentence September 17, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003686-2012
CP-51-CR-0009143-2012

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:               **FILED APRIL 13, 2016**

This is an appeal from the judgment of sentence entered in the Court

of Common Pleas of Philadelphia County after a jury found Appellant Lance

Masse ("Appellant") guilty of rape, sexual assault, indecent assault,

terroristic threats (two counts), retaliation against a witness or complainant,

intimidation, and stalking.[1]  Sentenced to an aggregate term of nine to

eighteen years' incarceration, Appellant contends that prosecutorial

misconduct during the course of trial requires us to vacate judgment of

sentence and remand for a new trial.  We affirm.

The trial court aptly provides a history of the case as follows:

---

[1] 18 Pa.C.S. §§ 3121(a)(1), 3124.1, 3126(a)(2), 2706(a)(1), 4953(a),
4952(a)(1), 2706(a)(1), and 2709.1(a)(1), respectively.

---

*Former Justice specially assigned to the Superior Court.

[Appellant] was found guilty of raping and sexually assaulting his former girlfriend. The crime occurred on January 17, 2012, at around 6:00 a.m. in the complainant's apartment located in the City and County of Philadelphia. [Appellant] called her at 4:30 a.m. upset and angry. At 5:00 a.m. he showed up at her apartment,[fn] entered the apartment and began yelling at her and calling her derogatory names. He said to her that he was there to "beat the shit out of her." The complainant tried to calm [Appellant], given his demeanor. He grabbed her cell phone and began looking through it. He then began demanding sex from her and the complainant refused.

---

[fn] [Appellant] and the complainant had previously lived together, however, in this instance, [Appellant] had spent the night at a hotel before going to the apartment they once shared.

---

The complainant stated [Appellant] said to her "My dick gets what my dick wants." With that, he pulled her hair, put his hand over her nose and threatened to break it. He then held her down, pulled down her pants and raped her. The complainant testified that she did not consent to have sex with [Appellant]. [Appellant], who testified at trial, maintained that he and the complainant had consensual sex that morning.

The complainant fled the apartment and called her friend, Rebecca Rodriguez. Ms. Rodriguez testified that the complainant called her around 7:15 a.m., and that she was extremely panicky, crying, upset, state that she had just been raped by [Appellant].[fn] The complainant went to Thomas Jefferson University Hospital where she reported that she had been sexually assaulted by her ex-boyfriend. Police were summoned and she was taken to the Special Complainants Unit that same day. Later that day, she was taken to Episcopal Hospital for a rape kit examination. From the evidence collected, DNA testing confirmed the presence of [Appellant's] sperm in and around the complainant's vagina.

---

[fn] N.T. 9/10/2013 [at 45].

---

Thereafter, on January 23, 2012, the complainant obtained a temporary protection from abuse order (PFA) against [Appellant]. There was an issue regarding service of the PFA

upon [Appellant] and whether [Appellant] had been served or had notice of the entry of the PFA Order.[fn]

---

[fn] At trial, [Appellant was found not guilty of violation of the protective order (18 Pa.C.S. § 4955), therefore, further details on this issue are not necessary, despite extensive testimony on the issue at trial.

---

Charges were eventually filed against [Appellant], who was arrested on February 8, 2012 after turning himself [over to] police. Thereafter, on February 25, 2012, [Appellant] repeatedly called the complainant's cell phone in excess of 50 times over a several hour period. Many of the calls were ignored by the complainant, but she did answer on several occasions and told [Appellant] of the PFA and to leave her alone. In response, [Appellant] made threats to her, advising her that he would put a bullet in his head or in someone else's head, that he knew that she moved back with her parents and knew where they lived. He further stated that if she did not appear in court, the charges against him would be dropped. It was these actions that gave rise to the additional charges being filed against [Appellant]….

Trial Court Opinion, filed March 16, 2015, at 2-4.

As noted, *supra*, the jury convicted Appellant on all counts except violating an existing PFA order, and the court imposed sentence. After the court entered an order denying post-sentence motions, this timely appeal followed.

Appellant raises the following issues for our review:

    I.    **DOES MISCONDUCT IN SUMMATION REQUIRE REVERSAL BECAUSE THE PROSECUTOR TOLD THE JURY THAT DEFENSE COUNSEL HAD TO RESORT TO TRICKS AND DECEPTION AND TIED SUCH TRICKS TO APPELLANT'S GUILT?**

    II.    **DID THE PROSECUTOR'S BLATANT ATTACK ON DEFENSE COUNSEL IN SUMMATION WHICH HAS**

- 3 -

BEEN CITED ABOVE VIOLATE DUE PROCESS OF LAW AS GUARANTEED BY THE FEDERAL CONSTITUTION?

III. DID THE CURATIVE INSTRUCTION CURE THE MISCONDUCT OR DID IT MAKE MATTERS WORSE?

IV. WAS THE MISCONDUCT IN SUMMATION HARMLESS?

V. DOES FURTHER MISCONDUCT BY THE PROSECUTOR IN THE FORM OF COACHING TWO OF HER WITNESSES WHILE THEY WERE ON THE STAND WARRANT REVERSAL?

Appellant's brief at 4.

Appellant's first four issues coalesce to ask this Court to determine whether the prosecutor's closing remarks denied him a fair trial so as to entitle him to remand for a new trial. Our standard of review of such a challenge is well-settled:

> The prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence. In considering a claim of prosecutorial misconduct, our inquiry is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one. Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect ... [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Further, the allegedly improper remarks must be viewed in the context of the closing argument as a whole.

*Commonwealth v. Smith*, 985 A.2d 886, 907 (Pa. 2009) (internal quotation marks omitted) (quoting *Commonwealth v. Washington*, 700 A.2d 400, 407–408 (Pa. 1997)). *Accord Commonwealth v. Hughes*, 865

A.2d 761, 801-802 (Pa. 2004) (holding remarks must be viewed in the context of the entire proceeding); *Commonwealth v. Boone*, 428 A.2d 1382 (Pa.Super. 1981) (holding allegedly prejudicial remarks must be read in context of entire case, with particular view to evidence presented and reasonable inferences drawn therefrom, to determine whether they are prejudicial).

"A prosecutor may not express his personal opinion regarding a defendant's guilt or credibility and, in doing so, clearly and improperly intrudes upon the jury's exclusive function of evaluating the credibility of the witness." *Commonwealth v. Gilman*, 368 A.2d 253 at 258, 259 (Pa. 1977)." "When the cumulative effect of improper remarks so prejudices the jury as to prevent a fair trial, a motion for mistrial must be granted." *Commonwealth v. Baranyai*, 442 A.2d 800, 803 (Pa.Super. 1982). The proper action to be taken is a matter within the discretion of the trial court. *Commonwealth v. Hickman*, 466 A.2d 148, 150 (Pa.Super. 1983). *Accord Commonwealth v. Correa*, 664 A.2d 607, 609 (Pa.Super. 1995) (instructing "the initial determination whether the prosecutor's remarks were unfairly prejudicial rests within the sound discretion of the trial court and our inquiry of necessity must turn to whether an abuse of discretion was committed.").

According to Appellant, the misconduct in question centers on the prosecutor's closing remarks on the defense strategy of cross-examining the complainant with her cell phone records and medical reports. With respect

to cell phone records, two sets of records logging voice calls involving the complainant's cell phone on February 25, 2012, shortly after authorities charged Appellant—one record printed out by the complainant herself from her phone and the other record certified by AT&T—were at issue. At trial, the prosecution introduced the AT&T record into evidence to establish that Appellant called the complainant's cell phone 56 times on February 25th in an attempt to harass and intimidate the complainant into withdrawing her complaint against him. The defense, however, sought to highlight what it argued were crucial differences between the AT&T record and the complainant's personal printout of the record, which the Commonwealth had initially included in its discovery.

Specifically, the defense set out to establish that the personal printout chronicled multiple outgoing calls from the complainant's phone to Appellant's phone on the day in question, suggesting that the complainant sought to establish and maintain contact with Appellant, behavior inconsistent with what one would reasonably expect from an alleged complainant of harassment, intimidation, sexual assault, and rape. Toward this end, defense counsel cross-examined the complainant extensively with a single page from her own personal printout of the phone record. The complainant denied the heading "number called" appearing on that page meant that a call was placed from her cell phone to the number listed, but

she conceded that is what the page stated. N.T., 9/11/13, at 69-70.[2]

Defense counsel went on to gain the complainant's agreement that the page therefore indicated eight phone calls in a row were made from her cell phone during the time in which Appellant allegedly called her 56 times. N.T. at 70-75.

The Commonwealth, however, effectively rebutted the defense tack on redirect, where it undermined the defense's use of this single page by referring to a more specific page from the complainant's print out as well as to the AT&T certified phone record:

> **Prosecutor:** First, I want to refer to what defense counsel marked as their first exhibit and the portions that were left out.
> Calling your attention to the back page where defense counsel stated [sic], is it fair to say that it does not reflect whether the phone call was incoming or outgoing?
>
> [court overrules defense counsel's hearsay-based objection]
>
> **Complainant:** Yes.
>
> **Prosecutor:** Now, I would like to call your attention to the first page of the document that counsel also had [gone] over.
>
> **The Court:** The first page of D-1 [defense exhibit #1]?
>
> **Prosecutor:** Correct.

---

[2] Supporting her position that the "number called" heading on the page in question did not mean calls placed by her phone, the complainant responded to defense counsel's question about one "number called" by explaining the number was that of the local police department, which had placed a call to her cell phone in response to her earlier 911 phone call. N.T. at 71.

**Prosecutor:** Does that show whether it's an incoming or outgoing call?

**Complainant:** Yes.

**Prosecutor:** Calling your attention to the specific calls that counsel referenced from 6:13 a.m., 6:29 a.m., 6:38 a.m., 7:37 a.m. – actually, all the phone calls involving the defendant's number, does it indicate that those were all, in fact, incoming phone calls that you received?

**Complainant:** Yes.

**Prosecutor:** Now, calling your attention now to the certified records referring to the exact same date, which was certified from AT&T –

[In response to defense objection, court reiterates earlier ruling deeming the AT&T report properly authenticated]

**Prosecutor:** Calling your attention now to the same time period where it says originating number, as in the number where the calls are coming from to your phone, all of those phone calls come from the defendant's phone number to your phone number, correct?

**Complainant:** Yes.

**Prosecutor:** There are no phone calls from your phone to his phone on that date, correct?

**Complainant:** [After clarifying that she inadvertently pressed a button that called Appellant's number but immediately hung up, resulting in a phone record indicating an outgoing call of zero seconds] Yes.

**Prosecutor:** Is it fair to say that all of the calls defense counsel referenced, the twelve-minute, five-minute, the everything, according to the records were actually incoming calls.

**Complainant:** Yes.

**Prosecutor:** And so the one page that counsel referred to does not actually reflect if those are incoming or outgoing calls, correct?

**Complainant:** Correct.

N.T., 9/11/13, at 77-79.

With respect to the prosecutor's commentary on defense counsel's use of hospital records, the record shows that defense counsel had just elicited from the complainant a detailed account of being forcibly overtaken and raped when he immediately segued to the Jefferson Hospital triage nurse report, asking, over objection, "[a]nd would it be fair to say that when you went to the hospital, it was found[] that you had no acute distress and no obvious discomfort; is that correct? N.T. at 46. Defense counsel sought a yes or no answer and suggested that the complainant, apparently relying on her nursing school experience, gave a response not in accord with the document's definition, although counsel eventually ceded to the court's ruling that the witness could explain her answer:

**The Witness:** No acute distress, meaning I could – no airway breathing circulation. That's what no acute distress means.

**Defense Counsel:** it says [']general appearance[']—you don't have any reason to doubt what's on this paperwork, correct?

**The Court:** If you're going to ask specifically about that paperwork, I want you to indicate to her what is it that you're referring to.

**Defense Counsel:** I'm referring to the triage nurse report and nurse's intake.

**The Court:** C-1?

- 9 -

> **Defense Counsel:** I believe so, Your Honor. . . . Where it begins with "Physical examine." It says, "General appearance, well nourished, alert, oriented times three, no acute distress, no obvious discomfort."
>
> **Defense Counsel:** [to witness] Do you agree with any of that ?
>
> **The Witness:** No acute disress means no airway –
>
> **Defense Counsel:** Do you –
>
> **Prosecutor:** I'm asking that this witness be able to answer.
>
> **The Court:** Yes. She can explain her answer.
>
> **Defense Counsel:** Okay. I'm asking her first is that what it says. If she wants to explain afterwards, Your Honor, she can.

N.T. at 46-47. Following this exchange, however, defense counsel confined the complainant to a yes or no answer on this same section of the triage nurse report and then moved to another section within the document without giving her the opportunity to explain.

> **Defense Counsel:** Now, was that what it said, yes or no?
>
> **The Witness:** Yes.
>
> **Defense Counsel:** Now, if you turn to page 3, it talks about your neck up top, correct?

N.T. at 46-47.

Defense counsel also reviewed the nurse evaluation performed at the Sexual Assault Response Center ("SARC") at the Hospital of the University of Pennsylvania, which included findings of no bruising, cuts, or abrasions anywhere on the complainant's body, N.T. at 51, prompting him to ask the

complainant if it was true that there was nothing in the report to "indicate that you were forced down in any sort of way by way of bruising[.]" *Id.* When the prosecution subsequently called the SARC nurse to testify, he explained that while he found no "gross injuries [such as] lacerations, bruising, that kind of thing[,] such a finding was not inconsistent with the patient having been sexually assaulted. N.T., 9/12/13, at 47-48. He further explained that the Jefferson Hospital assessment of "no acute distress" is a triage determination of whether a "more severe medical complaint that could lead to somebody's death within that day or within a few hours [is apparent]." N.T. at 53-54. He provided examples of acute distress, such as when "someone [is] crawling on the floor from the chest pain they're having[, or when] somebody [is] going into shock because a broken bone is sticking through their arm. That's acute distress." N.T. at 54.

During her summation, the prosecutor implored the jury not to allow defense counsel's exclusive focus on a single page of the complainant's personal printout of her phone record to divert its attention from those additional parts of the complainant's printout and the AT&T certified record establishing that all calls were made from Appellant's phone to the complainant's phone. Appellant directs us to the following passage containing what he contends were unfairly prejudicial remarks constituting grounds for reversal:

> Remember when she was on the stand and she was being questioned about the phone calls on the 25th? She was questioned, you see right here. ["]You made those calls. You

made those calls.["] Recognizing that the records that the defendant had both say[] that they were all incoming calls from the defendant, yet [sic] he sat her up there and for five minutes or more grilled her trying to convince her that she had made these calls when the evidence was to the contrary. That was an attempt to trick her. To break her down even more, to confuse her. Quite frankly, it was an attempt to trick you. And why would you need to be tricked if the defendant wasn't guilty? You wouldn't be. The blatant attempt of misreading and misguiding [sic] those phone records, was an attempt to distract you away from the truth because focusing on the fact that he called her over 55 times in under three hours, what does that do? Make him look guilty. It's consciousness of his own guilt. The Judge will specifically instruct you that that's exactly what you could take that to mean.

***

Now, where was the other trick? Remember when [the complainant] again was being grilled about her medical records at Jefferson and the defendant approached her with things of, ["]Well, there was no acute distress, there [were] no disturbances observed["] and tr[ied] to imply that in some way that meant she was calm, cool, and collective [sic] and that everything was fine[?] When you heard from an expert in the nursing field [testify] "No, no, no, acute distress means when a bone is coming out of your skin, when you're having a heart attack, when you're going to die in --

[defense objection led to a sidebar discussion, prompting the court to instruct the jury, to defense counsel's satisfaction, that counsels' respective recollections of the evidence in closing arguments are not controlling and are not evidence, and if either counsel says anything that disagrees with the jury's recollection of the facts, the jury's recollection is controlling. Defense counsel then resumed her summation.]

As we all heard [the medical expert/SARC nurse] Mr. Brophy testify to what was described [as acute distress] in those medical records were extreme circumstances and yet [the complainant] was interrogated about them at some length because she didn't show those signs. That was another attempt to trick, to deceive, to distract you from the actual evidence and the actual truth.

So in response to defense counsel's closing, there is no guidebook as the defense has made multiple attempts to try to trick and distract you away from the truth. The Judge is going to instruct you not to be tricked, not to be deceived, but to follow the actual evidence and to judge it, to judge the actual[ ] credibility of the evidence and he's going to give you tools in order to do that.

N.T., 9/13/13, at 35-36, 38-39.

At the conclusion of the prosecutor's closing, and out of the jury's presence, defense counsel moved for mistrial, arguing that the prosecutor's repeated references to defense counsel's attempt to trick the complainant and the jury were fatally inappropriate. The trial court agreed with defense counsel that the remarks were "inappropriate" but disagreed they rose to the level of depriving the defendant of a fair trial so as to warrant the extreme remedy of a mistrial.

Instead, the court decided it would issue a curative instruction, but it would not go so far as to tell the jury that what the prosecutor said was improper or that defense counsel was not, in fact, attempting to trick them. Rather, the court instructed the jury to disregard the prosecutor's remarks that defense counsel tried to trick them as it was for the jury, alone, to decide whether either counsel was attempting to deceive them or was, instead, merely zealously advocating his or her respective position:

**The Court:** So ladies and gentlemen of the jury, you heard Ms. Kemp, attorney, for the Commonwealth, state at various times during his trial Mr. Klineburger, attorney for the defendant, tried to trick you with some questions he asked of the various witnesses, including specifically questions [posed] to [the complainant]. You are to disregard that statement. It is for you and you alone, members of the jury, to determine whether

- 13 -

either counsel attempted to trick or deceive you or whether they were diligently representing their respective position. Again, it is for you and you alone, members of the jury, to rely on your own recollection of the testimony that you find to be credible in reaching your verdict in this case.

Counsel, that's sufficient?

**Defense counsel:** Yes, Your Honor.

**Prosecutor:** Yes, Your Honor.

N.T. at 64.

Appellant contends the prosecutor's closing remarks denied him his right to vigorous counsel, and he defends defense counsel's cross-examination of the complainant with what he calls "two contradictory sets of phone records" and with her medical record. Appellant's brief at 23. In a case pitting the credibility of the complainant against that of Appellant, the prosecutor's argument that defense counsel would not need to use tricks if his client was not guilty was particularly damaging and warranted a mistrial, Appellant posits.

In this regard, Appellant cites as support for reversal this Court's decision in *Commonwealth v. Raffensburger*, 435 A.2d 864 (Pa.Super. 1981), in which we reversed rape and kidnapping convictions and remanded for a new trial for what we determined was reversible misconduct in the prosecutor's summation, consisting predominantly of overt attacks on defense strategy, frequent expressions of personal opinion and belief, and a "continual stream of personal anecdotes." *Id.* at 869. Imbedded within an

already a broadly sweeping appeal to emotion was what this Court deemed

"[p]erhaps the single most troubling remark," which stated:

> You know, gentlemen [of the jury], defense counsel, and I say this sincerely, and I also say this in terms of argument, but the defense counsel, I believe, *is trying to make a fool out of this jury*. He wants to make you believe that poor Kenneth Raffenberger is just riding around the country. Got himself a little bit drunk, and really had no idea what he was doing....

*Id*. at 870. We went on to say:

> This statement unmistakenly alters the issue before the jury. No longer were they being asked to determine the witnesses' or appellant's credibility, but rather the prosecutor's; no longer were they being asked to determine whether the evidence showed beyond a reasonable doubt that appellant's actions fell within the bounds of statutorily prohibited behavior, but to determine whether or not they, the members of the jury, would appear as fools to the 225,000 inhabitants of York County. Furthermore, not only does the remark challenge the jury to render a verdict of guilty because otherwise they would appear foolish, but it expresses a personal opinion about the defendant's trial strategy. On the latter point the Supreme Court has stated:
>
> > Our decisions have firmly established that the prosecutor may not express his personal opinion regarding a defendant's guilt, credibility, or trial strategy. We have ruled that (t)he determination of guilt must not be the product of fear or vengeance, but rather intellectually compelled after a disinterested, impartial and fair assessment of the testimony that had been presented. ***Commonwealth v. Harvell***, ***supra***, 458 Pa. at 411, 327 A.2d at 30 (emphasis in original).
>
> ***Commonwealth v. Gilman***, 470 Pa. at 189-190, 368 A.2d at 258. (Footnotes omitted). The prosecutor's statement undeniably violates the prohibition against comment on defense counsel's trial strategy. So too does the statement about the pre-trial proceedings when the prosecutor said:

- 15 -

> All of this that (Defense Counsel) wants to throw at
> you about the method of identification....
>
> The statement clearly disparages defense counsel's method of
> defending his client. It also implies that the defense strategy
> was not aimed so much at determining the truth but at hiding it
> from the jury.

*Id.*

Consistent with our standard of review, however, this Court went on to view the objectionable remark in context of the whole case before determining whether grounds for reversal existed. In this respect, we found it significant that the Commonwealth's case against the defendant relied upon fine subtleties, as it was undisputed that the defendant was not one of the four cohorts who physically raped the victim, was previously unknown to the victim, and the victim—who could not make out the face of the second abductor—relied exclusively on the length and color of the defendant's hair and his position in the passenger seat after her abduction to deduce that he was the second abductor who initially left the vehicle and forced her into the back seat. The defendant, however, had testified he had been driving and could not have abducted the victim, and he presented corroborating evidence that he was asked to yield driving duties and sit in the passenger seat at some point after the abduction because he was too inebriated to drive safely. He also sought to exculpate himself on the charges of confinement and rape on the theory that he was too inebriated to form the requisite intent to aid and abet in the commission of these crimes.

On weighing the prosecutorial remarks against the strength of the evidence presented at trial, we said:

> In considering these [prosecutorial] remarks we must be mindful of the fact that the balance in this case is a delicate one. This was not the case of a prosecution for actual rape. The violators of the complainant's corporal sanctity had already been brought to justice. In the instant case, however, there was neither evidence presented nor the contention made that appellant was one of the rapists. Rather, the question to be placed before the jury on the rape charge was one subtler than whether appellant had or had not violated the complainant's person. It was to be a question which dealt with appellant's intent: did he aid and abet his fellows in their heinous act, or was he merely present, too drunk to come even to his own aid? As for the kidnapping charge, the question was to be whether the complainant correctly or incorrectly deduced that appellant was one of the abductors based on her observations only of the perpetrator's hair color and that the cab's passenger had done the deed, and conclusion that appellant, who admits to having been in the passenger's seat later, was seated there at the time of the abduction. The circumstances of the case and the evidence adduced at trial raised fine questions for the jury's determination. Although these questions were not so subtle that the jury, in its wisdom, and guided by its common sense and a dispassioned analysis of the evidence, could not have decided them, they were of such a nature that the jury easily could have been swayed to render an improper verdict by the prejudicial remarks of an over-zealous prosecutor.

*Id.* at 868.

What distinguishes the present case from *Raffensberger*, however, is not only the comparatively stronger presentation of incriminating evidence against Appellant but also the prosecutor's overarching message calling upon the jury to remain focused on essentially unrebutted testimony regarding Appellant's 56 phone calls to the complainant and the medical expert's explanation of medical terminology in the hospital reports. In stark contrast

- 17 -

to the difficulties associated with the Commonwealth's attenuated identification evidence in **Raffensberger**, the incriminating evidence in the present case included the complainant's detailed account of Appellant's aggression leading up to the rape, the rape itself, and her immediate and consistent report of the event to both a friend and SARC medical providers who performed a rape kit that same day. Evidence that Appellant phoned the complainant 56 times in a single day after charges were filed further bolstered the incriminating evidence against Appellant.

With respect to the prosecutor's call to focus on the evidence, the present case is more akin to the prosecutor's emphasis on the evidence in **Commonwealth v. Smith**, 467 A.2d 1307 (Pa.Super. 1983), in which the prosecutor cautioned the jury against being "fooled by the smokescreen defense,-[objections by defense counsel]-this hallucination defense.... Look at all the evidence. Don't be fooled. [Objections of counsel.]" **Id** at 1319. In affirming the convictions in **Smith** despite the negative references to defense counsel's employed strategy, we distinguished such commentary from that made in **Raffensberger**, of which we said:

> The remark there [**Raffensberger**] condemned was, "[T]he defense *counsel, I believe, is trying to make a fool out of this jury.*" **Id.** at 205, 435 A.2d at 870 (original emphasis). This court condemned that remark as deflecting the inquiry from whether guilt was proven beyond a reasonable doubt to whether or not the jury was appearing in a foolish light. Furthermore, this remark occurred in a summation in which the prosecutor blatantly attacked defense strategy, repeatedly expressed his personal opinion and constituted a "continual stream of personal anecdotes." **Id.** at 204-205, 435 A.2d at 869. In the case

- 18 -

> before us, however, the summation taken as a whole and with the contested remark in context constitutes an appeal to the jury to use its collective intelligence and logic in assessing all of the evidence.

*Id* at 1321 n.20.

Similarly, though criticizing defense counsel's use and characterization of evidence and tying it to a rhetorical question concerning Appellant's guilt, the prosecutor primarily kept the focus of her summation on the evidence and asked the jury to do the same. Absent in her closing were the more egregious examples of prosecutorial conduct noted in *Smith*, including: *Commonwealth v. Gilman*, 368 A.2d 253 (Pa. 1977) (invalidating closing remarks mounting lengthy plea to jury's emotions while characterizing defense as incredible, shrewd, and calculating strategy to becloud issue and deceive jury from seeing defendant as he really was, a cunning, sly, calculating, and deceiving cold-blooded killer); *Commonwealth v. Harvell*, 327 A.2d 27, 29 (Pa. 1974) (invalidating closing plea that the members of the jury not "be fooled" occurring within long harangue appealing to jury's passions and prejudices regarding fear of crime in the community and warning jury it could free the defendant but "it might be one of you next time."); *Commonwealth v. Long*, 392 A.2d 810 (Pa.Super. 1978) (invalidating prosecutor's string of disparaging remarks, including appeal to jury that it not allow defendant "to sneak out of this courtroom under the cover of smoke" and reference to defense counsel as a "not guilty machine" and prosecutor as being required to search for truth). *See also Commonwealth v. Young*, 692 A.2d 1112, 1116 (Pa.Super. 1997)

(upholding judgment of sentence where defense counsel's tactics, while perhaps inappropriate, were not likely "to inflame the jury to such a degree that it would be incapable of dispassionately considering the evidence.").

In the case *sub judice*, therefore, we find the prosecutor sufficiently mitigated the potential for prejudice arising from her closing remarks where she had already introduced and developed pertinent evidence during trial that convincingly undermined defense counsel's interpretation of the phone and medical records, and where she ultimately advanced as the prevailing theme in her summation that such evidence was dispositive of the issues. N.T., 9/11/13, at 77-80; 9/13/13 at 47. Though potentially problematic given the negative characterization of defense counsel's tactics, the remarks in question were not the central feature of the prosecutor's 20-page closing argument. On balance, the strength of the Commonwealth's evidence—both in general and with respect to the phone and medical records—cause us to perceive no reversible prejudice arising from the characterization of defense counsel's advocacy on the two records as tricky and distracting. Accordingly, we discern no error with the trial court's ruling denying Appellant's request for mistrial.[3, 4]

_____

[3] Assuming, *arguendo*, that Appellant's challenge to the court's cautionary instruction was preserved despite his affirmative acceptance of the instruction, we disagree with his argument that the instruction exacerbated the potential for prejudicing Appellant. Indeed, the instruction initially instructed the jury to disregard the prosecutor's remarks that defense counsel had attempted to trick it or distract it from incriminating evidence. *(Footnote Continued Next Page)*

In Appellant's remaining issue, he contends the prosecutor twice impermissibly coached Commonwealth witnesses during cross-examination when she nodded her head in response to defense counsel's questioning. The two instances were as follows:

> **Defense Counsel:**    Despite the fact that it says number called from wireless detail of your number, you're claiming that these were actually calls made from Mr. Masse to you, correct?
>
> **Complainant:**   Yes.
>
> **Defense Counsel:**    I would ask that Ms. Kemp stop nodding her head to the witness.
>
> **Prosecutor:**    I'm sorry, Your Honor, I'll wait until its my turn.
>
> **The Court:**    Do I have to tell you that, Ms. Kemp?

*(Footnote Continued)* ———————

It is well-settled that juries are presumed to follow such instructions. From there, the instruction treated both counsel identically, charging the jury that it was the sole decision-maker as to whether either counsel had gone too far in his or her advocacy or had, instead, fairly represented the evidence and simply advocated zealously in that respect. Far from infusing any unfair prejudice that would give cause for reversal, such instruction charged the jury appropriately that it, and it alone, would recollect and interpret the evidence and all reasonable inferences therefrom.

[4] Appellant raises a corresponding federal constitutional law claim that the prosecutor's comments violated his due process rights. Our Supreme Court has explained that the same standard applicable to a state-based prosecutorial misconduct claim applies to a corresponding federal constitutional law claim. *See Hughes*, 865 A.2d at 801-802 (instructing that "both [state and federal] standards concentrate on the effect of the improper remarks upon the fairness of the verdict and are thus consistent."). Accordingly, for the reasons set forth above, Appellant's federal due process claim fails.

**Prosecutor:** No, you do not, Your Honor. It won't happen again.

**The Court:** Proceed.

N.T., 9/11/13, at 75.

**Defense Counsel:** So if there was a voicemail message saved, was that something you would have preserved?

**Complainant:** Yes.

**Defense Counsel:** Again, Your Honor, I would ask that the Commonwealth stop nodding yes or no.

**The Court:** Stop [directed at complainant].

\*\*\*

**Complainant:** Sorry, Judge.

**Prosecutor:** I didn't even realize I did.

**The Court:** I was reading C-5 as the witness was speaking. I didn't think I had to monitor the actions of a very experienced counsel in here.

You know you're not supposed to make any kind of gestures or facial expressions or anything like that. If that is occurring, I would ask whoever is doing it to stop doing it.

**Prosecutor:** Yes, Your Honor.

N.T., 9/11/13, at 153-154.

In neither instance did defense counsel seek a mistrial or curative instruction after the trial court ostensibly granted defense counsel's request that the prosecutor be instructed to stop nodding her head. Now, Appellant contends that "the court had [the] opportunity [to correct whatever it is that was objected to] and took no action at all." Appellant's brief at 39. We

disagree. The record clearly shows the court admonished counsel in the presence of the jury pursuant to the specific defense objection and request made.

To the extent Appellant now contends, for the first time on appeal, that the court erred in failing to give a curative instruction or to declare a mistrial, we find Appellant failed to preserve such a claim with a timely and specific objection requesting such relief. **See Commonwealth v. Shamsud–Din**, 995 A.2d 1224, 1228 (Pa.Super. 2010) (citation omitted) (Holding "in order for a claim of error to be preserved for appellate review, a party must make a timely and specific objection before the trial court at the appropriate stage of the proceedings; the failure to do so will result in waiver of the issue."). We likewise reject Appellant's bald assertion that requesting such relief with the court would have been futile, a contention he makes to avail himself of an exception to the waiver doctrine recognized in the decisional law of this Commonwealth:

> Requiring a litigant to make a timely, specific objection during trial ensures that the trial court has a chance to correct alleged trial errors. **Dilliplaine v. Lehigh Valley Trust Co.**, 457 Pa. 255, 322 A.2d 114, 116 (1974). We have stressed that "[w]aiver is indispensable to the orderly functioning of our judicial process and developed out of a sense of fairness to an opposing party and as a means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party has failed to preserve." [**Reilly by Reilly v. Southeastern Pennsylvania Trasnp. Authority**], 489 A.2d 1291, at 1300].
>
> There exists, however, an exception to the waiver doctrine. We first announced this exception in **Commonwealth v. Hammer**,

508 Pa. 88, 494 A.2d 1054 (1985). According to our decision in *Hammer,* in limited circumstances, a party may raise allegations of judicial misconduct for the first time in post-trial motions. While trial counsel has an obligation to object to improper language and/or behavior in the courtroom to effectively represent his or her client, there may be circumstances in which objections have a deleterious effect on the jury or even on the judge whose behavior is extremely unprofessional.

\*\*\*

In addressing the allegations of judicial misconduct in *Hammer*, we held that:

> On this record, whereas it *appears that objection would be meaningless* to satisfy the reasons for raising objection *and, as further reflected by this record,* indeed *intensified judicial animosity,* justice is not served by the strict application of the waiver doctrine. Accordingly, we hold that the failure of trial counsel to object to questioning by the judge, who is charged with a function of self-regulation, *will not under all circumstances* render the allegation of judicial impropriety unavailable for appellate review.

*Id.* at 1060 (emphasis added).

*Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1124-25 (Pa. 2000). We do not, however, share the notion necessarily implicit in Appellant's argument that the matter under review involves an instance of judicial misconduct or impropriety. Nor do we find Appellant has, for that matter, demonstrated that raising the specific objection he now makes would have been a futile, meaningless act met likely to have produced a counterproductive effect. We, therefore, find this line of jurisprudence inapposite to the present claim.

Even if we were to address the merits of this claim, we would adopt the trial court's opinion dismissing it for want of a demonstration of prejudice:

> [E]ven if this issue had been properly preserved, the effects of these two limited instances over the course of a 5-6 day trial, fails to reveal that such head nodding had, in fact, influenced the answers to the questions posed, nor can the [Appellant] show that such action resulted in any prejudice to the [Appellant]. There is nothing in the record to even suggest that the Commonwealth used any improper means to influence the elicited response or that the response would have been different had the nodding not occurred. This Court reasonably presumed that Ms. Kemp [prosecutor], as an officer of the court and in discharge of her duties, had acted in good faith and said nodding motions were inadvertent and not done with any intent to influence, sway or otherwise have an effect upon the sworn testimony being presented. Further, such occurrence did not deprive the [Appellant] of a fair trial.

Trial Court Opinion, March 16, 2015, at 27-28. Finding the court acted well within its discretion in addressing the prosecutor's two instances of head nodding, we conclude this claim affords Appellant no relief.

Judgment of sentence is AFFIRMED.
Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2016